HONORABLE RICARDO S. MARTINEZ

# UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| SUE HONG, on behalf of herself and all others similarly situated,<br><br>                    Plaintiff<br><br>vs.<br><br>BANK OF AMERICA, N.A, individually and as successor-in-interest, QBE INSURANCE CORP., NATIONAL GENERAL HOLDINGS CORP., and DOES 1-10.<br>                    Defendants. | NO. 2:20-cv-01667-RSM<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiff Sue Hong files this Second Amended class action complaint on behalf of herself and all others similarly situated against BANK OF AMERICA, N.A. ("BOA"), QBE INSURANCE CORP. ("QBE"), and NATIONAL GENERAL HOLDINGS, CORP.

## I. NATURE OF THE CASE

1.      Plaintiff, customer of Defendants, has been the victim of unfair, deceptive acts or practices, misrepresentations, breaches of contract, violations of the Washington Consumer Protection Act, violations of the duty of good faith and fair dealing, and breach of fiduciary duty committed by Defendants in the course of transactions involving the Defendants' mortgage servicing practices. Plaintiff is a resident of the State of Washington, and the primary Defendants are companies doing business in every state in the United States including the State of Washington.

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 1
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

2.      Plaintiff, Sue Hong, brings this action against defendants for breach of the Washington Consumer Protection Act and common law claims for breach of contract, violations of the duty of good faith and fair dealing, and breach of fiduciary duty arising from a monopolistic arrangement between BOA, its mortgage servicing entities and its mortgage servicing vendors, QBE, and National General and other DOES 1-10, to lender placed insurance (LPI) on Sue Hong's property, and others similarly situated, and charge her, and others similarly situated, amounts styled as insurance charges but which were, in fact, far greater than the actual costs of protecting the properties serving as collateral for the mortgage loans.  Ms. Hong brings such claims individually and on behalf of similarly situated borrowers across the State of Washington and across all States in the United States.

3.      Lenders and mortgage servicers like BOA force-place insurance when a borrower fails to obtain or maintain required insurance on property serving as collateral for the loan. Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force-place" a coverage on the property.  The lender also has the right to then impose a charge to the borrower to recoup the lender's costs for the insurance.

4.      These LPI schemes have been exposed by journalist and regulatory investigations. J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May 18, 2012. Attached as Exhibit 1.

5.      Plaintiff does not challenge the practice of force-placing insurance.  Nor does Plaintiff challenge the insurance rates charged by the FPI insurers nor the premium amounts paid by BOA to the FPI insurers.  Rather, Plaintiff challenges the amounts styled as FPI insurance charged to borrowers by BOA.  The amounts charged borrowers by BOA are not insurance premiums nor a pass-through of insurance premiums.

SECOND AMENDED CLASS ACTION COMPLAINT- Page 2
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

## II. CLASS REPRESENTATIVE PLAINTIFF

6.      Class Plaintiff, Sue Hong, owns property commonly known as 22515 10th Ave S, Des Moines, WA 98198-6914 in King County, Washington. Plaintiff has purchased or otherwise acquired a home with a mortgage or mortgages which were serviced by the Defendant, BOA, and had LPI placed on her property by Defendants, within the six years before the commencement of this action.

7.      The Plaintiff brings this Complaint on her own behalf and on behalf of a Class of similarly situated customers of the Defendants who purchased a mortgage(s) or had their mortgage(s) serviced by BOA and had LPI placed on their property by Defendants.  Plaintiff brings these claims, in her representative capacity, on behalf of an entire Class and any subclasses which the Court may deem suitable or necessary for prosecution of these claims including a National Class and a Washington Class.

8.      Washington Class: All people whose loan was secured by residential property, including site-built homes, manufactured and mobile homes and individual cooperative and condominium units, was located in the State of Washington, was serviced by Bank of America and were charged a net amount for LPI greater than zero during the class period.

9.      National Class: All people whose loan was secured by residential property, including site-built homes, manufactured and mobile homes and individual cooperative and condominium units, was located in the United States other than in Washington State, was serviced by Bank of America and were charged a net amount for LPI greater than zero during the class period.

10.     The start of the class period is defined by the statute of limitation for each cause of action alleged in the Class Action Complaint.

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 3
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA  98101-3614
(206) 501-4446

11.    The Plaintiff Class Representative files this complaint and institutes these proceedings for breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, and violation of provisions of the Washington Consumer Protection Act, RCW 19.86 et seq. (Washington Class only), and conspiracy to commit the above noted breaches and violations on behalf of the Washington and National classes pursuant to FRCP 23.

### III. DEFENDANTS

12.    Defendant Bank of America, N.A, ("BOA") is a Delaware corporation. BOA has its principal place of business in Charlotte, North Carolina. BOA provides services including but not limited to banking, insurance, investments, property mortgages, and consumer and commercial finance in Washington and across the United States. Defendant BOA is a National Bank which does business in every State in the United State including the State of Washington.

13.    QBE INSURANCE CORPORATION (QBE) is a Pennsylvania corporation. QBE refers to a group of subsidiaries of QBE North America who provided force-placed insurance and other services to mortgage servicers until the sale by QBE of it force-placed insurance business to National General in 2015. The QBE entities involved in forced placed insurance include the QBE FIRST insurance agency, QBE INSURANCE CORPORATION, QBE Specialty Insurance Company and Praetorian Insurance Company. QBE provides FPI and other services to mortgage servicers in every State in the United States including the State of Washington.

14.    NATIONAL GENERAL HOLDINGS CORP is a Delaware corporation. NATIONAL GENERAL refers to the group of subsidiaries of National General Holdings, Corp who provide force-placed insurance and other services to mortgage servicers following National General's acquisition of QBE's force-placed insurance business in 2015. The National General entities involved in force-placed insurance include National General Lender Services, Integon Specialty Insurance Company, National General Insurance Company and Agent Alliance

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 4
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

Insurance Company. National General provides FPI and other services to mortgage servicers in every State in the United States including the State of Washington.

15. On information and belief, DOES 1-10 are yet to be identified companies who wrote forced-place insurance policies for BOA during the class period and do business throughout The United States.

16. Defendants are liable for the wrongful acts of their agents and employees where said wrongful acts are committed in the course and scope of agencies or employment.

17. Plaintiff reserves the right to amend the pleadings to add names of other, or successor, corporations, as discovered, as well as to add a claim for piercing the corporate veil, naming responsible parties individually and as marital communities, as cause to do so is discovered.

18. True names and identities of Does 1-10, are not known to Plaintiffs at this time and will be added after Discovery is conducted.

## IV. JURISDICTION AND VENUE

19. This Court has jurisdiction over this action, inter alia, under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) & (6), this Court has jurisdiction because (a) the proposed Class is comprised of at least 100 members; (b) there is minimal diversity between the parties; and (3) the aggregate claims of the members of the proposed Class exceed $5 million, exclusive of interest and costs.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because BOA and QBE are subject to personal jurisdiction here and regularly conduct business in this District, and because a substantial part of the events or omissions giving rise to the claims of the named Plaintiff in this Complaint occurred in this District.

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 5
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

1

## V. THE LPI MARKET PLACE

2      21.    When originating a mortgage loan for residential property, lenders require the

3   borrowers have insurance in place to protect the property serving as collateral for the loan.  The

4   loan agreement also requires borrowers to maintain required insurance to continuously protect the

5   property.  The mortgage agreement includes a provision that if the borrower fails to maintain the

6   required property insurance, the lender may obtain insurance at the borrower's expense.  This

7   insurance obtained by the lender in the event a borrower fails to maintain required insurance is

8   called force-placed or lender-placed insurance ("LPI").  The insurers/vendors selling LPI typically

9   bundle LPI with a number of outsourced services for the lender/servicer unrelated to the actual

10  provision of LPI.  Consequently, a description and analysis of the products, economics, markets,

11  and competition of LPI requires explanation of the structure and role of mortgage servicers in the

12  U.S. mortgage system.

13      22.    Once a mortgage loan is originated, the loan must be serviced.  Loan servicing

14  involves every activity required to manage the mortgage loan following origination including, for

15  example, collecting payments from borrowers, distributing funds to mortgage owners/investors,

16  ensuring required insurance is in place to protect the collateral, working with delinquent borrowers

17  and closing out the mortgage.  While some mortgage lenders service the loans they have originated,

18  the vast majority of mortgage loans are sold to investors or government-sponsored enterprises who

19  hire organizations that specialize in loan servicing to perform the servicing.

20      23.    One of the requirements mortgage owners impose on mortgage servicers is to

21  maintain continuous insurance coverage on the properties serving as collateral for the mortgage

22  loans.  Mortgage servicers ensure continuous insurance coverage by purchasing a LPI master

23  policy covering all the loans in the servicer's portfolio.

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 6
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA  98101-3614
(206) 501-4446

24.    LPI is a commercial group insurance policy issued to the mortgage servicer which covers all properties in the servicer's mortgage loan portfolio and provides automatic coverage if and when the borrower's voluntary insurance policy lapses. The mortgage servicer pays a premium to the LPI insurer for the LPI if and when coverage is extended under this master insurance policy for a specific property in the event that the borrower has failed to maintain required voluntary insurance. In turn, the servicer assesses a charge to the borrower styled as an insurance charge. In the event the borrower fails to pay the LPI charge to the servicer, the servicer is reimbursed by the owner/investor of the loan.

25.    Insurance tracking is part of the mortgage servicer's escrow administration function. Servicers must track borrower's insurance for a variety of reasons, including when to disburse funds from escrow to pay the renewal premium for the borrower's voluntary (e.g., not force-placed) insurance. Servicers also track borrower's insurance to ensure the required insurance – type of insurance company, amount of insurance, type of policy – meet the lender's requirements. Most mortgage servicers, contract with vendors to provide insurance tracking and other mortgage servicing functions related insurance-related servicing responsibilities. These vendors are typically the same companies providing the LPI.

## VI.    LPI Placement and LPI Premium Growth and Decline 2004-2016

26.    There was dramatic growth in the amount of LPI insurance nationwide between 2004 and 2011. Table 1 shows the nationwide total of LPI net written premium for insurers writing LPI from 2004 through 2016. Through 2011, the largest writers of LPI, by far, were Assurant and Balboa. In 2008, the third largest LPI vendor was ZC Sterling. QBE entered the U.S. LPI market at the end of 2008 by acquiring ZC Sterling, which acted as a managing general agency administering LPI programs for servicers. After acquiring ZC Sterling, QBE renamed the managing general agency QBE FIRST and later merged QBE FIRST into the QBE North America

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 7
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 First Avenue, Suite 501
Seattle, WA 98101-3614
(206) 501-4446

operations as the Financial Partner Services business unit.  In 2011, QBE acquired the Balboa LPI business from Bank of America.  Table 1 shows Balboa experience separately from QBE through 2011.  The ZC Sterling / QBE / National General column shows ZC Sterling experience through 2009, then QBE / ZC Sterling experience through 2011, then combined ZC Sterling and Balboa experience as QBE through 2015.  QBE sold its LPI business to National General Holdings effective October 1, 2015.  The ZC Sterling / QBE / National General column shows National General experience for fourth quarter 2015 and all of 2016.

**Table 1:  Nationwide LPI Net Written Premium, 2004 – 2016 ($US Millions)**

| Year | Assurant | Balboa | ZC Sterling / QBE / National General | Other | Nationwide Total |
|------|----------|--------|--------------------------------------|-------|------------------|
| 2004 | 543 | 237 | - | 16 | 796 |
| 2005 | 641 | 242 | 148 | 36 | 1,067 |
| 2006 | 851 | 210 | 204 | 14 | 1,279 |
| 2007 | 1,219 | 418 | 359 | 10 | 2,006 |
| 2008 | 1,640 | 551 | 501 | 6 | 2,698 |
| 2009 | 1,745 | 1,138 | 557 | 11 | 3,451 |
| 2010 | 1,810 | 1,060 | 513 | 11 | 3,394 |
| 2011 | 2,022 | 1,113 | 429 | 9 | 3,573 |
| 2012 | 2,186 | - | 1,332 | 19 | 3,537 |
| 2013 | 2,012 | - | 732 | 17 | 2,761 |
| 2014 | 1,612 | - | 560 | 286 | 2,457 |
| 2015 | 1,196 | - | 500 | 472 | 2,169 |
| 2016 | 1,114 | - | 364 | 404 | 1,882 |

27.    Table 2 shows the loss ratio (ratio of incurred claims to earned premium) on a nationwide basis for LPI and for homeowners insurance by year over the period.  Homeowners insurance is the most common type of voluntary residential property insurance – insurance purchased by the homeowner to protect the property.  Table 2 shows LPI loss ratios were consistently very low both in absolute terms and relative to homeowner's insurance which provides protection for many of the same perils as LPI.  As discussed in more detail below, the very low

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 8
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

loss ratios were necessary to support the LPI business model of competing for servicer business by providing considerations to the servicer, the cost of which were paid for by inflated LPI premiums that were passed on to borrowers and investors/owners by the loan servicers styled as insurance charges charged to borrowers by BOA. The amounts charged borrowers by loan servicers are not insurance premiums and, consequently, do not affect the insurance regulatory oversight of LPI rates and premiums..

**Table 2: Nationwide Loss Ratios of Homeowners Insurance and LPI, 2004-16**

| Year | Homeowners | LPI Home |
|------|-----------|----------|
| 2004 | 66.0% | 33.1% |
| 2005 | 75.2% | 53.5% |
| 2006 | 48.2% | 29.0% |
| 2007 | 50.4% | 20.5% |
| 2008 | 70.7% | 23.3% |
| 2009 | 59.3% | 20.7% |
| 2010 | 60.5% | 17.3% |
| 2011 | 75.4% | 24.7% |
| 2012 | 58.8% | 30.8% |
| 2013 | 46.4% | 28.3% |
| 2014 | 49.6% | 28.1% |
| 2015 | 49.9% | 28.5% |
| 2016 | 52.6% | 38.4% |
| **2004-2016** | **58.7%** | **28.9%** |

## VII.    Roles and Responsibilities of Mortgage Servicers

28.    Mortgage servicers, such as BOA, service loans on behalf of themselves if they own the loans and on behalf of entities that own the loans. One of the requirements mortgage owners impose on mortgage servicers is to maintain continuous insurance coverage on the properties serving as collateral for the mortgage loans. Mortgage servicers ensure continuous insurance coverage by purchasing a LPI master policy covering all the loans in the servicer's

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 9
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

portfolio.  The LPI master policy  provides coverage automatically as needed – whenever the borrower fails to maintain the  insurance required by the mortgage owner and servicer.

29.    Mortgage servicers are also required to track the presence of borrowers required voluntary insurance.  The insurance tracking function includes, among other things, monitoring and obtaining evidence of required insurance, notifying borrowers to produce evidence of required insurance (if the mortgage servicer has not otherwise obtained the evidence) and directing the LPI insurance company to issue coverage under the master LPI policy for a specific property.

30.  Loan servicing typically includes the following activities:

- Borrower inquiries
- Billing and Repayment
- Tax and insurance escrows
- Adjustments and changes
- Delinquency and collections
- Pay-off and release
- Internal accounting and management reporting

31.    When the loan servicer services loans for secondary market investors or government agencies (as opposed to servicing loans owned by the mortgage servicer or an affiliate of the mortgage servicer), additional activities include:

- Investor accounting and management reporting
- Servicing portfolio pricing, selling and acquisition
- Delivery and quality control

32.    For a loan servicer to fulfill these responsibilities, the servicer will typically have separate departments to perform five essential functions:

1. Payment Processing
2. Loan Accounting
3. Escrow Administration
4. Customer Service
5. Delinquency and Collection

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 10
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA  98101-3614
(206) 501-4446

## VIII.  The Mortgage Servicer's Responsibility to Ensure Continuous Insurance Coverage for Serviced Mortgage Loans and the Role of LPI and Insurance Tracking

33.     Standard mortgage loan agreements include a requirement that the borrower maintain insurance to protect the property serving as collateral for the loan and, if the borrower fails to maintain the required insurance or fails to provide required evidence of insurance, the lender (owner/investor), through the servicer, may place insurance on the property serving as collateral for the loan and charge the borrower for this insurance.  The standard agreement also includes provisions for access to claim payments for the voluntary insurance so the lender/servicer can ensure that insurance claim payments are used to restore the property serving as collateral for the mortgage loan.  This verification and release of funds is typically one of the functions outsourced by a servicer to the LPI vendor.

34.     Among other responsibilities, the mortgage servicer is required, through its servicing agreement with the owners of mortgage loans, to maintain continuous insurance coverage on the properties serving as collateral for the loan.  The Fannie Mae servicing guidelines describe the typical requirements by the investor of the loan servicer and include:

    a.  Requirements for the property insurance coverage, including perils covered and amount of coverage;

    b.  Requirement for the insurer providing the property insurance coverage, including the financial strength of the insurer;

    c.  Requirements to maintain continuous insurance coverage, including force-placement of coverage if the borrower fails to maintain required insurance;

    d.  Requirements for tracking the borrower's compliance with insurance requirements; and

    e.  Requirement for communication with the borrower about required insurance.

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

35. The insurance requirements of the loan servicer involve three distinct activities:

- tracking insurance on loans being serviced;
- timely disbursing of payments from borrowers' escrow accounts for renewal premium due for the borrowers' property insurance for those loans with escrow for insurance; and
- placing LPI when the borrower fails to maintain the required insurance coverage.

36.     The division of responsibilities – insurance tracking for the servicer, provision of LPI coverage under the master policy by the insurer – requires the borrower to keep sufficient insurance coverage in force to satisfy the lender's interest should the structure (collateral) be destroyed or damaged. In order to make sure this requirement is met, most lenders have a department which keeps track of all the insurance policies covering properties for outstanding loans. If borrower provided coverage is cancelled or expired, the lender begins sending a series of follow-up letters to the borrower reminding the borrower of his obligation to keep insurance in force. If the borrower fails to comply, the lender will request issuance of the policy."

### IX.     LPI is a Group Insurance Policy Issued to the Mortgage Servicer Providing Coverage Automatically As Needed When a Borrower's Voluntary Insurance Coverage Lapses

37.     The LPI insurance policy sold to the servicer is a commercial group insurance master policy.  The master policy covers a group of properties and not just a single property like the homeowner's insurance policy purchased by a borrower.  A master policy means that the policy covers all eligible properties and, as a property becomes eligible for coverage, a certificate of coverage for the individual property is issued under the master policy. A property becomes eligible for coverage when the borrower's voluntary insurance policy lapses – ceases to remain in-force.

38.     LPI coverage is provided for different perils (events which cause damage like fire, flood or wind) and for different stages of the mortgage process (non-REO when the mortgage

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 12
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 First Avenue, Suite 501
Seattle, WA 98101-3614
(206) 501-4446

exists and REO when the borrower has defaulted on the mortgage and the servicer has foreclosed on the property with the investor/owner of the mortgage now owning the property).

39.     These LPI coverages – hazard, flood and wind – are issued as master policies to the servicer with individual coverage extended from the master policies as needed.  The servicer pays the premium for the insurance as issued by the LPI insurer and, subsequently, assesses a charge styled as an insurance charge charged to borrowers to recoup the amount the servicer paid to the LPI insurer.  If the borrower fails to pay the LPI charges and the borrower ultimately defaults on the mortgage, the investor/owner of the mortgage will reimburse the servicer for the premiums paid by the servicer to the LPI insurer and remaining unreimbursed to the servicer by the borrower.

40.     The LPI insurance policy provides that coverage begins on any property in the servicer's covered mortgage loan portfolio at the instant that the borrower's voluntary policy ceases to provide the required coverage.  This provision is called automatic coverage.  The LPI policy provides coverage, for example, if the borrower's homeowners insurance policy is canceled by the borrower or the insurance company or lapses because of non-payment of premium.  To ensure that the property serving as collateral for its loans is always protected by insurance, the LPI policy provides coverage whenever the borrower's required insurance fails to remain in-force – even if the servicer or its vendor do not discover this failure of insurance coverage for days or weeks after the borrower's policy coverage has ended.  The LPI master policy covers all properties in the servicer's loan portfolio and provides coverage as needed.

41.     Unlike voluntary homeowners' insurance for which the insurer may accept or reject properties to insurer, the LPI master policy provides coverage for any property in the servicing portfolio for which voluntary insurance has lapsed at the time of lapse.  Consequently, the LPI insurer cannot predict with accuracy the specific properties that will be insured a few or many months into the future.  In addition, the business model for LPI insurers does not include the

SECOND AMENDED CLASS ACTION COMPLAINT- Page 13
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA  98101-3614
(206) 501-4446

property inspection or the refined pricing found in homeowners' insurance. With homeowner's insurance, the premium will be based on many factors, including granular geographic location, building type and policyholder characteristics, like credit score and claims history. In contrast, LPI has developed with a simplified rating that involves only information available from the lender about the property with none of the individual consumer and property risk assessment of homeowner's insurance.

42.    The components of an insurance rate are claim costs (including claim settlement expenses and net reinsurance costs), profit, taxes/licenses/fees, acquisition expense (including commissions to agents who produce business for the insurer and policy issuance) and general and administrative expenses (including management, underwriting, actuarial, regulatory, policy administration and other expenses). The low loss ratios for LPI, shown in Table 2 above, indicate the non-claim portion of the premium dollar is much greater than that for voluntary residential property insurance. This is due to the large expense loadings in LPI rates intended to cover the cost of some or all of the outsourced services, even if these services are unrelated to the provision of LPI.

## X.  LPI Markets Are Characterized by Kickbacks from LPI Providers to Mortgage Servicers as Consideration for Steering the LPI Business.

43.    LPI markets are characterized by reverse competition, which means that the insurers compete for the lender's or servicer's business because these entities have the market power to steer the ultimate consumer to the insurer. In a reverse-competitive market, the insurers compete for the lender's or servicer's business by offering a variety of considerations to the lender, the cost of which drives up the costs to the ultimate consumer.

44.    Evidence from regulatory and journalist investigations, indicates that the LPI premium charges from LPI insurers to mortgage servicers are inflated far above the reasonable

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 14
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA  98101-3614
(206) 501-4446

cost of providing LPI coverage to protect the properties serving as collateral for the mortgage loans. A significant amount of the inflated LPI premiums charged by the LPI insurer to the mortgage servicer is kicked back to the mortgage servicer through a variety of mechanisms, including a past practice of payment of "commissions" to a servicer-affiliated insurance agent and currently the provision of free or below-cost services by the LPI vendor to the servicer. The mortgage servicer typically charges borrowers the same amount for LPI as the mortgage servicer paid in premium to the LPI insurer, thereby causing borrowers to pay for the kickbacks.

45.    To illustrate the kickback, assume that the reasonable cost of providing LPI is $500. The LPI insurer, however, charges the mortgage servicer $1,000 and kicks back $500 to the mortgage servicer through various mechanisms. The mortgage servicer then charges borrowers, whose voluntary coverage has lapsed, the $1,000 amount with the result that the relatively small percentage of borrowers charged for LPI are paying for the $500 kickback from the LPI insurer to the mortgage servicer. The $500 kickback may take the form of free or below-cost services unrelated to the provision of LPI or reimbursed expenses.

## XI.    Evidence From Journalist and Regulatory Investigations Confirm the Business Model for LPI Involved High Premium to Servicers Coupled With Kickbacks from the LPI Insurer to the Mortgage Servicer. The Kickbacks Were Paid For Through Excessive Charges by the Servicer to Borrowers or Investors

46.    Starting in 2010, evidence from regulatory and journalist investigations indicated that the LPI premium charges from LPI insurers to mortgage servicers were inflated far above the reasonable cost of providing LPI coverage to protect the properties serving as collateral for the mortgage loans. The high premium cost of LPI, which was passed on to borrowers by the servicers as LPI charges, included significant amounts returned to the servicers through a variety of mechanisms, including:

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

- "Commissions" paid by the LPI insurer to a servicer-affiliated insurance agent or broker even though the affiliated agent performed no work related to the LPI;

- Cash payments to servicers characterized as "expense reimbursements";

- Profits from ownership interest by the servicer or affiliate of the servicer in the LPI insurer, such as Bank of America's use and ownership of Balboa;

- Profits from captive reinsurance arrangements in which an affiliated insurance company of the servicer reinsured the LPI issued to the servicer; and

- Free or below-cost outsourced servicers unrelated to the provision of LPI by the LPI vendor to the mortgage servicer, including insurance tracking, new loan boarding, loss draft and escrow administration.

47.    The Commissioner of the New York Department of Financial Services, following an investigation of LPI practices by servicers and LPI vendors, described these practices as part of a "kickback culture that has pervaded the force-placed insurance industry" in a letter to fellow insurance regulators.[1]

48.    As Table 2 above shows, the loss ratios for LPI were very low, which, coupled with premium charges typically much greater than a homeowner's policy premium for the same property, generated the funds for the LPI insurer to pay the cash kickbacks in the past or pay for the free and below-cost outsourced services or reimbursed expenses.

49.    In 2011, the New York Department of Financial Services ("NY DFS") started an investigation into LPI practices of mortgage servicers and mortgage insurers.  At a three-day, public hearing in May 2012, representatives of large mortgage servicers, Assurant and QBE, were questioned by NY DFS officials.  The hearing revealed various forms of kickbacks from LPI vendors to mortgage servicers.  Representative from GMAC testified that Balboa paid an upfront payment of $4.5 million to GMAC in 2007 in connection with GMAC moving LPI and outsourced

---

[1] http://www.insurancejournal.com/news/east/2013/04/09/287749.htm .

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

services for part of its loan servicing portfolio – Homecomings Financial – from Assurant to Balboa. The GMAC representative also testified that the servicer paid nothing for insurance tracking and outsourced services from Balboa/QBE although it had paid a tracking fee to Assurant for the Homecomings business. Matt Freeman, the LPI executive from QBE, was unable to explain the purpose of a $9 million dollar payment to AHMSI. AHMSI testified that they had received an up-front payment from QBE of over $9 million for marketing and commissions paid to an insurance agency affiliated with AHMSI. Based on its investigation, the NY DFS took enforcement actions against these entities and entered into consent orders, with numerous findings describing the various profit- and revenue arrangements, in 2013 with Assurant, Balboa and QBE involving restitution to consumers, filing of lower LPI rates and prohibition on most of the kickback practices, discussed in more detail below.

50.    Shortly following the 2013 consent order with the NY DFS, QBE and Wells Fargo settled a Florida class action lawsuit alleging unreasonable and excessive LPI charges by Wells Fargo to borrowers.

51.    In early September, 2013, a few months after the Wells Fargo class action settlement, Chase and Assurant entered into a nationwide settlement with borrowers to resolve LPI litigation over excessive LPI charges to borrowers by Chase in which they agreed to forego some of these practices.

52.    In February 2012, 49 state attorneys general, the District of Columbia and the federal government announced a historic joint state-federal settlement with the country's five largest mortgage servicers, including Bank of America. The settlements followed investigations into foreclosure abuses and included financial assistance to borrowers and wide-ranging reforms and standards for mortgage servicing. Among dozens of servicing requirements, the settlements included requirements for servicers for LPI, including:

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 17
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

- Placing LPI only if there is a reasonable basis to believe the borrower has failed to maintain required property insurance;

- Imposing a charge only after certain notices and consumer outreaches are made;

- Attempting to maintain a borrower's voluntary coverage if the borrower's loan has escrow; and

- Purchasing LPI at commercially reasonable rates.

53.    In the aftermath of the 2008 financial crisis, the U.S. Congress passed the Dodd-Frank Act ("DFA") in 2010 to create a regulatory structure to prevent future financial crises. Among many provisions, the DFA created the Consumer Financial Protection Bureau ("CFPB") and, among many consumer protection responsibilities, directed the CFPB to develop mortgage servicing standards and codify those standards in a regulation.  The CFPB developed and proposed for public comment a proposed mortgage servicing rule and adopted a final rule in January 2013, with most provisions, including the LPI provisions, effective January 2014.

54.    The CFPB mortgage servicing rule placed requirements and restrictions on servicers charging borrowers for LPI.  Servicers are prohibited from charging a borrower for force-placed insurance unless the servicer (1) has a reasonable basis to believe the borrower has failed to maintain hazard insurance and (2) has provided the required notices.  A first notice is required at least 45 days before charging for forced-place insurance and a second notice is required no earlier than 30 days after the first notice.  Charges related to force-placed insurance must be for a service actually performed and must bear a reasonable relationship to the servicer's cost of providing the service.  The rule established standards for servicer refunds of LPI charges and prohibited a servicer from force-placing insurance for a delinquent borrower with an escrow if the servicer can maintain the borrower's hazard insurance, even if this requires the servicer to advance funds to maintain the voluntary insurance because the borrower's escrow account has insufficient

funds.  The rule also included model LPI notices containing the information required by the rule for the notices.

55.    With the exception of some small servicers, the CFPB mortgage servicing rules covered all mortgage servicers, whether a federally-regulated bank or credit union, a state-regulated bank or credit union or a non-bank servicer.  Consequently, the CFPB mortgage servicing rule had broad impact on, among many mortgage servicing functions, insurance tracking and LPI placement and LPI charge assessment practices.  One of the effects of the rule was to standardize the timing and content of warning letters to borrowers regarding required insurance and placement of LPI.  Another consequence of the rule was subjecting servicers to regulatory penalties for failure to comply with the rule's LPI requirements.

56.    From 2011 to 2013, the NY DFS conducted an investigation of LPI providers and markets.  Among other things, the NY DFS investigation revealed:

- The premiums charged to homeowners for force-placed insurance are two to ten times higher than premiums for voluntary insurance, even though the scope of the coverage is more limited.

- The loss ratios for force-placed insurance seldom exceed 25 percent. Nevertheless, rate filings made by insurers with NY DFS reflected loss ratio estimates of 55 to 58 percent.

- Insurers and banks have built a network of relationships and financial arrangements that have driven premium rates to inappropriately high levels ultimately paid for by consumers and investors.

- Force-placed insurers have competed for business from banks and mortgage servicers through "reverse competition": i.e., rather than competing for business by offering lower prices, insurers have created incentives for banks and mortgage servicers to buy force-placed insurance with high premiums by enabling banks and mortgage servicers, through complex arrangements, to share in the profits associated with the higher prices.

57.    In April 2013, NY DFS entered into consent orders with QBE and Balboa (the "QBE Consent Orders") regarding LPI practices.

SECOND AMENDED CLASS ACTION COMPLAINT- Page 19
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

58. The QBE Consent Orders included prohibitions on specific practices, including:

- The LPI insurer shall not pay LPI commissions to a servicer or entity affiliated with the servicer;

- The LPI insurer shall not provide free- or below-cost outsourced services to servicers, lenders or their affiliates; and

- The LPI insurer shall not make any payments to servicers, lenders or their affiliates in connection with securing business.

59. In 2015, the NY DFS promulgated a regulation regarding LPI that makes clear that insurance tracking is separate from the provision of LPI and expenses for insurance tracking may not be included in LPI premiums. The regulation defines insurance tracking:

(f)(1) *Insurance tracking* means all activities related to determining whether a borrower has in place hazard insurance that complies with the mortgage loan contract's requirements to maintain hazard insurance, including:
(i) developing and maintaining a database used by a servicer to track required hazard insurance on borrowers' loans;
 (ii) maintaining hazard insurance information on behalf of a servicer, including in a servicer's mortgage servicing system;
(iii) inputting insurance information on new loans into an insurance tracking database or a servicer's mortgage servicing system;
(iv) all communications by a servicer or on behalf of a servicer with a borrower's voluntary hazard insurer or voluntary hazard insurance producer;
(v) all communications by a servicer or on behalf of a servicer with a borrower concerning required hazard insurance, including the written notices required by section 227.2 of this Part and communications concerning charging the borrower's account for insurance; and
(vi) all call center and other customer service operations related to the communications described in subparagraphs (1)(iv) and (1)(v) of this paragraph.

60. The regulation specifically prohibits provision of free or below-cost insurance tracking to a servicer or any payment of expenses to the servicer in connection with securing the LPI business:

(f) No insurer, insurance producer, or affiliate shall make any payments, including but not limited to the payment of expenses, to a servicer or a person

or entity affiliated with a servicer in connection with securing force-placed insurance business.

(g) No insurer, insurance producer, or affiliate shall provide insurance tracking to a servicer or a person or entity affiliated with a servicer for a reduced fee or no separately identifible charge.

61.    The regulation prohibits an LPI insurer from including any insurance tracking expense in its LPI rates:

(f) An insurer shall not include as an expense in a force-placed insurance rate filing any expense incurred in connection with insurance tracking.

62.    The NY DFS regulation also prohibits the type of arrangement utilized by QBE and mortgage servicers.  The regulation states:

The department's investigation found that insurers offered financial incentives to mortgage servicers and their affiliates, including commissions to servicer-affiliated insurance producers who performed little or no work, and entered into arrangements that transferred a significant percentage of force-placed insurance profits to affiliates of servicers. In addition, one insurer provided force-placed insurance on mortgages serviced by an affiliate of the insurer. These practices not only artificially inflated premiums charged to homeowners, but created a conflict of interest in that servicers had an incentive to purchase more costly force-placed insurance where they earned a portion of the premiums or profits from the placement of force-placed insurance. Section 227.6 of this Part prohibits these practices.

63.    In 2012 and 2013, the Florida Office of Insurance Regulation ("FL OIR") investigated LPI practices through the review of LPI rate filings by Assurant and QBE.  In 2012, QBE submitted a rate filing by Praetorian Insurance Company to create a new LPI program in order to combine the existing Balboa and QBE programs and to move the existing QBE LPI program from surplus lines to an admitted insurance company.  The existing QBE program was provided through QBE Specialty Insurance Company which was a surplus lines insurer.  Unlike admitted insurers, which file with and obtain approval from insurance regulators for the policy forms and rates for their products, surplus lines insurance forms and rates are not filed with or

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

subject to regulatory approval.  The unregulated QBE Specialty rates were higher than the Balboa admitted rates.

64.     Following a public hearing on the Praetorian rate filing in 2012, the FL OIR issued a notice of intent to disapprove the rate filing stating that a rate reduction of 35-36% was indicated. After extended negotiations, Praetorian revised its rate filing and obtained approval in February 2013 for an overall rate reduction of 18.8%.

65.     Following another public hearing on an Assurant rate filing in 2013, the FL OIR entered into consent orders with QBE and Assurant which were similar to those entered into by the NY DFS with QBE and Assurant.  The Assurant consent order was filed in October 2013 and the QBE consent order was filed in March 2014.  The Consent Order between the FL OIR and QBE – In the Matter of Praetorian Insurance Company – prohibited Praetorian (now providing LPI in Florida for the combined QBE/Balboa business) from:

- Paying commissions to a servicer or entity affiliated with the servicer;
- Issuing LPI to a servicer affiliated with Praetorian;
- Reinsuring LPI with an affiliate of a servicer;
- Profit-sharing with a servicer or affiliate of a servicer;
- Provide free- or below-cost outsourced servicers to a servicer; and
- Incentive payments or expense reimbursements for securing LPI.

## XII.  THE RELATIONSHIP BETWEEN BOA NA, QBE INSURANCE, AND NATIONAL GENERAL INSURANCE

66.     With the above as context, the abuses during this time period can be summarized as including: 1) the placement of LPI by the lender/loan servicer thru a wholly owned subsidiary; 2) the payment of unearned commissions by an insurer directly to a lender/loan servicer or to an agency affiliated with the loan servicer; 3) the creation of captive reinsurance companies owned or affiliated with the lender/loan servicer to whom premiums would be ceded; 4) the reimbursement of expenses by the insurer to the lender/loan servicer or an affiliate; and 5) the provision of free or below cost services offered by the insurer to the lender/loan servicer. All added

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 22
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 First Avenue, Suite 501
Seattle, WA 98101-3614
(206) 501-4446

1  to the profit of the lender/servicer because they would pass the actual cost, as opposed to the

2  discounted cost, of these practices on to financially troubled borrowers.

3       67.    These practice was ongoing for years prior to the Class period in this case and were

4  the subject of a class action settlement entered in United States District Court, Southern District

5  of Florida, *Hall v. Bank of America NA*, Case No. 1:12-cv-22700-FAM for claims during a Class

6  Period that ended in February 2014.  In the *Hall* settlement BOA and QBE ostensibly agreed to

7  end the practices outlined in paragraph 66 above for a period of only five years following the

8  Final Settlement date.  However, BOA and QBE excepted out certain below cost

9  services  and reimbursement of fees they claimed were for QBE's own benefit in placing LPI.

10 BOA and QBE specifically excluded from the prospective relief in the *Hall* settlement ongoing

11 cash payments by QBE to BOA for the sale of Balboa which were believed to be tied to

12 the profitability of QBE' LPI business.

13      68.    To put this into context, in or around 2008, BOA purchased Balboa and essentially

14 wrote its own LPI policies thru this wholly owned subsidiary.   In part in response to pressure

15 brought by the above investigations, in or around 2011 BOA sold its interest in Balboa's LPI

16 market to QBE in a 10-year deal scheduled to end in 2021.  Under this deal QBE would pay BOA

17 a lump sum up front and then continue to pay BOA unspecified cash amounts which are believed

18 to have been predicated on, among other things, the performance of QBE's LPI business with

19 BOA.  These cash payments were excluded from the *Hall* settlement.  In or around 2015 QBE's

20 LPI practice was sold to National General who continued to enjoy the exclusive right to write LPI

21 policies for BOA thru the remainder of the class period.

22      69.    After the sale of Balboa to QBE and the settlement in *Hall*, it is believed that BOA

23 has continued to grant an exclusive relationship to QBE, National General, and one or more DOES

1-10, to monitor the insured status of borrowers and place insurance on properties without

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 23
NO. 2:20-cv-01667-RSM, Hong v Bank of America

meaningful oversight, appraisal or underwriting and to reimburse certain expenses and provide

certain services at below market rates and then charge the true costs to its most financially troubled

borrowers.  It is also believed that BOA continues to receive cash payments related to the sale of

Balboa to QBE and that those payments are tied to the performance of QBE and its successors',

including National General, LPI business with BOA.

70.    The Plaintiff's present claims arise from practices which occurred after September

30, 2014.

### XIII.  BOA RELIES ON STANDARDIZED MORTGAGE AGREEMENTS WHEN IT PLACES INSURANCE.

71.    Most mortgage agreements serviced by BOA contain standardized contract terms

governing a borrower's duties and what steps BOA may take if those duties are breached.  See

Hong "deed of trust" (Exhibit 2).

72.    Other examples include the standard Freddie Mac "deed of trust" recommended for

loans originated in the State of California (Exhibit 3), Freddie Mac "deed of trust" recommended

for loans originated in the State New York (Exhibit 4) and "deed of trust" recommended for loans

originated in the State of Washington (Exhibit 5).

73.    These various standardized instruments contain common and similar language

which (1) requires a borrower to maintain hazard insurance, (2) provides that the servicer (BOA)

may place lender placed insurance (LPI) on the property if the borrower fails to maintain hazard

insurance, and (3) contains a clause requiring that the servicer's actions be reasonable and/or

appropriate.

74.    All members of the Washington and National classes have mortgage agreements

containing similar language.

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 24
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 First Avenue, Suite 501
Seattle, WA  98101-3614
(206) 501-4446

1

2

### XIV.  BOA ENTERED AN EXCLUSIVE AGREEMENT WITH QBE, AND SUBSEQUENTLY NATIONAL GENERAL, FOR THE PROVISION OF LPI AND RELATED SERVICES.

75.     The standard form mortgage agreements owned or serviced by BOA include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency, and wind insurance coverage on the property securing the loan, and in the event the insurance lapses, permit BOA to obtain force- placed coverage and charge the borrower for the associated costs rather than declare the borrow in default.

76.     What is unknown to borrowers and not disclosed in the mortgage agreements is that BOA has an exclusive arrangement with QBE, National General, and other DOES 1-10, and their affiliates to manipulate the force- placed insurance market and charge borrowers more for LPI than permitted by the mortgage contract. BOA pays QBE, National General, and other Does 1-10, premiums for master group policies which cover BOA's entire portfolio of mortgage loans, and QBE, National General, and other DOES 1-10 then kicks back a portion of these premium payments through reimbursement of expenses and free or below-cost services unrelated to the provision of LPI.  When BOA places LPI on a borrower's property, these charges include not just the actual net cost to BOA for the protection of the property serving as collateral for the loan, but also the amounts of the kickbacks from the LPI insurers to BOA.  The charges, styled as LPI insurance, are actually amounts to finance the kickbacks from the LPI insurers to BOA.  This practice not only unreasonably inflates the charges to borrowers for FPI but forces the small percentage of borrowers for whom LPI is placed – in the range of 3% -- to pay for expenses associated with servicing the entire portfolio, like insurance tracking.

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA  98101-3614
(206) 501-4446

## XV. **THE FORCE-PLACED INSURANCE SCHEME**

77.     QBE, National General, and other DOES 1-10, have entered exclusive arrangements with BOA to provide various mortgage servicing functions at below cost; mortgage servicing functions that are properly BOA's responsibilities and that BOA is paid to perform by the owners of all loans, and to reimburse certain expenses to BOA. QBE, National General, and other Does 1-10, also contract to monitor BOA's mortgage loan portfolio and force-place insurance when an individual borrower's voluntary policy lapses, both obligations properly borne by BOA.

78.     Counsel for BOA has indicated that BOA and its affiliates no longer receive direct monetary commissions from QBE related to the placement of LPI, and Plaintiff therefore is not alleging that this specific practice has continued at this time on the basis of this representation. Should discovery disclose otherwise, Plaintiff reserves the right to amend this allegation.

79.     While some of the kickback methods have been stopped due to class action settlements or regulatory prohibition, the kickbacks and associated inflated charges to borrowers continue through at least two mechanism --- the future payments based on LPI volume per the sales agreement between BOA and QBE, the reimbursement of expenses, and the provision of free or below-cost services unrelated to the provision of insurance, including tracking.

80.     QBE, National General, or other DOES 1-10, and their affiliates monitor BOA's loan portfolio for lapses in borrowers' insurance coverage. Once a lapse is identified, an automated cycle of notices, purporting to come from BOA but actually generated by QBE, National General, or another DOE 1-10, is sent to the borrowers to inform them that insurance will be purchased and force-placed if the voluntary coverage is not continued. In reality, however, the master group policy is already in place and BOA does not purchase a new policy on the individual borrower's behalf, rather, a certificate of insurance from the master policy is automatically issued by QBE,

FRIEDMAN | RUBIN®
1109 First Avenue, Suite 501
Seattle, WA 98101-3614
(206) 501-4446

National General, or another DOE 1-10. If a lapse continues, the borrower is notified that insurance is being force-placed at his or her expense.

81.    No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property in an amount decided by BOA without any underwriting analysis.  BOA charges amounts styled as insurance charges but which are, in fact, far greater than the actual costs of protecting the properties serving as collateral for the mortgage loans. Inflated costs, including the real value of the discounted services and reimbursements provided by QBE, National General, and other DOES 1-10, are charged by BOA to the borrower. In many instances, the insurance lapse is not discovered for months or even years after the fact. Despite the absence of any claim or damage to the property during the period of lapse, coverage is placed on the property and BOA charges the borrower for the claimed  cost of the retroactive coverage.

82.    BOA then pays QBE, National General, or another DOE 1-10, a premium for the certificate of insurance, which issues from the already-existing master policy. BOA's obligation to pay QBE, National General, or another DOE 1-10, for the force-placed insurance arises from the agreements between BOA and QBE, National General, or another DOE 1-10, which govern the mortgage servicing functions that QBE, National General, and other DOES 1-10, perform as well as the procurement of the master policy, and are executed and already in place before the borrower's coverage lapses.

83.    Once the certificate of insurance is issued on an individual borrower, BOA then charges that borrower all costs associated with the LPI including the full, "pre-discounted" amount for the coverage while purporting to charge the borrower the cost of the insurance coverage in keeping with the borrower's mortgage agreement. The inflated charge is either deducted from the

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA  98101-3614
(206) 501-4446

borrower's mortgage escrow account or added to the balance of the borrower's loan. The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.

84.    QBE, National General, and other DOES 1-10 enter into agreements for QBE, National General, and other DOES 1-10 to provide mortgage servicing activities on BOA's loan portfolio at below cost that they claim are related to the LPI. But it is believed that these activities include, but are not limited to, loan portfolio compliance monitoring, new loan Boarding, escrow administration, and loss draft functions – which have nothing to do with force-placed insurance. QBE, National General, and other DOES 1-10 offer to take on these mortgage servicing functions – which are BOA's responsibilities pursuant to its agreements with the owners of the loans – at a discount to maintain its exclusive right to force-place insurance on BOA borrowers. Indeed, QBE, National General, and other DOES 1-10 do not perform these services for BOA without also being the exclusive provider of force-placed insurance.

85.    The full cost of the servicing activities is added into the costs BOA charges its borrowers. QBE, National General, and other DOES 1-10, and their affiliates are able to provide these services at below cost because of the enormous profits they make from the hyper-inflated amounts charged for force-placed insurance. However, because insurance-lapsed mortgaged property typically comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers who pay the charges from the lenders unfairly bear the entire cost to service the entire loan portfolio – despite the services having nothing to do with force-placed insurance. These charges, passed on to Plaintiff and the proposed Class members by BOA, are not properly chargeable to the borrower because they are expenses associated with the servicing of all the loans and BOA is already compensated for these activities by the owners of all its loans.

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 28
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

86.     Under this highly profitable force-placed insurance scheme, BOA is effectively paid twice for costs associated with loan servicing, once by every borrower in their loan portfolio and then a second time through charges assessed to borrowers who have LPI placed on their property.  BAO is also incentivized to place as much LPI as possible because the cash payments they receive for the sale of Balboa to QBE and its successors is tied at least indirectly to the profitability of their LPI business.

87.     QBE, National General, and one or more DOES 1-10, on behalf of BOA, would not undertake any underwriting activities or investigation specific to the property in default.

88.     For example, QBE, National General, and one or more DOES 1-10, would place a policy on behalf of BOA which would be based on the payoff of a loan, or the limit of insurance coverage previously selected by a borrower without evaluating whether those policies were appropriate for the property it was seeking to insure.

89.     Borrowers' suffer additional economic harm and damage from inflated charges styled as LPI beyond the unreasonable amount of those charges.  LPI charges can result in additional interest charges and additional fees.

90.     The actions and practices described above result in borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property charged more than BOA's real cost of coverage for force-placed insurance. These charges cover undisclosed costs of discounted mortgage servicing functions and reimbursed expenses.

91.     Borrowers have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies. Force-placed policies are commercial insurance policies with premiums intended for all lender or servicer clients of QBE, National General, and other DOES 1-10 and are meant to protect their interest in the property not the borrowers. The terms are determined by the lender or servicer and the insurers.

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 29
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

92.     Plaintiff here does not challenge BOA's right to force place insurance in the first instance. Plaintiff challenges Defendants' manipulation of the force-placed insurance market with an eye toward charging borrowers amounts styled as FPI that are, in reality, far greater than the net cost paid by BOA for the insurance. Lenders or servicers, like BOA, are financially motivated to select the insurer, like QBE, National General, and other DOES 1-10, that offers them the best financial benefit in the terms of discounted mortgage servicing functions or reimbursement of costs. This is particularly true here because BOA is believed to obtain payments from its sale of Balboa to QBE under a 10-year agreement that began in 2011 that is believed to tie these payments to the financial success of QBE and its successors.

## XVI.  THE INSURANCE CONTRACTS PLACED FOR BOA CONTAIN UNIFORM CLAUSES

93.     The insurance contracts placed by BOA contains similar terms. Specifically, these similar terms provide (1) that the insurance contract will only provide for the repair of the improvements on real property, and (2) that the extent of repairs that the insurer would pay for are limited to a specific limit of coverage in the policy.

94.     The insurance contracts placed by BOA contain similar terms providing that the cost of the premium is in part indexed to the limit of coverage procured.

95.     The effect of these terms is that if BOA procures insurance with a limit of liability set by QBE, National General, or one or more DOES 1-10, which is significantly higher than the cost required to repair the property in question, the insurer bears no risk that it will ever have to pay out on that extra coverage and pockets that portion of the premium as pure profit.

96.     BOA in turn passes on all  costs associated with the insurance to the borrower by charging the cost to the borrower's escrow account or adding to the principle balance owed on the

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 30
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA  98101-3614
(206) 501-4446

1  mortgage even when a portion of the insurance coverage purchased provides no benefit to BOA

2  or the borrower

### XVII.  A PRACTICE OF OVER-INSURING IS A BREACH OF THE TERMS OF THE UNIFORM DEED OF TRUST AND IS A VIOLATION OF WASHINGTON STATE LAW

97.    The practices described above are  a breach of the terms of the mortgage contract which limit BOA's actions under the Deed of Trust to those actions which are reasonable and necessary to accomplish the protections provided it under the mortgage contract.

98.    BOA also over insures a borrower's property by choosing an insured value tied to a payoff amount of a loan, or the limit of insurance coverage previously selected by a borrower without evaluating whether those amounts were reasonable and necessary to protect their interests under the LPI provisions in the mortgage contract.

99.    The Defendants' LPI practices are not reasonable or necessary to secure a borrower's property. See Hong "deed of trust". A copy of the Note is attached as Exhibit 6.

100.    For example, in various statutes and regulations, the State of Washington has made it clear that Servicers and Insurers are not permitted to require borrowers to over-insure their property.

101.    The Washington Department of Financial Institutions (hereinafter "DFI") regulates servicers in the State of Washington and has some expertise on Washington law.

102.    In a newsletter issued in the Fall of 2017, the DFI stated its concern that Servicers and Insurers were requiring Washington borrowers to over insure their properties. One key issue is that with increasing property values, there was an increasing difference between the value of a property and the value of the improvements on the property. Since hazard insurance only protects against harm to the improvements on property and not the value of the property itself, Servicers that required a borrower to obtain hazard insurance equal to the value of the loan were in violation

of Washington law because the appropriate determination for the amount of insurance coverage was the cost required to repair the improvements existing on real property. See Exhibit 7.

103.    Recently the DFI issued regulations providing that Servicers were prohibited from purchasing force placed insurance at a price that is "not commercially reasonable." WAC 208-62-551(2)(c).

## XVIII.  SUE HONG

104.    Plaintiff Sue Hong entered into mortgage agreements with defendant BOA, with language which includes the following provisions:

> **A. Property Insurance**.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  The insurance shall be maintained in the amounts … and for the periods that Lender requires.

> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability, and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of the Borrower secured by this Security Instrument …

> "If (a) Borrower fails to perform the covenants and agreements contained in this Security instrument . . . then Lender may do and pay for whatever is *reasonable or appropriate* to protect the Lender's interest in the Property." (Emphasis Added)

105.    A separate paragraph dealing with charges a servicer may pass on to a borrower in the event of a default clarifies and provides:

> "If (a) Borrower fails to perform the covenants and agreements contained in this Security instrument . . . then Lender may do and pay for whatever is *reasonable or appropriate* to protect the Lender's interest in the Property." (Emphasis Added)

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 32
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

The term "reasonable or appropriate" limits the Lender's discretion as to the costs it passes on to a Borrower.

106.    All members of the Washington and National classes have substantially similar agreements.

107.    Ms. Hong has had LPI placed on her property by BOA, and charged charges styled as insurance by BOA, from 10/21/14 thru the present,

108.    Neither BOA nor its agents made any effort to determine whether the Dwelling coverage was appropriate. Instead, BOA, through QBE, National General, and other DOES 1-10, without undertaking any underwriting analysis would calculate the amount of coverage and cost of an insurance policy by simply assigning a value to the covered property which would then be used as a multiplier for the rate set in the jurisdiction. For example, QBE, National General, and one or more DOES 1-10, would place a policy on behalf of BOA which would be based on the payoff of a loan, or the limit of insurance coverage previously selected by a borrower without evaluating whether those policies were appropriate for the property it was seeking to insure. At the same time, the insurance policy written by QBE, National General, and other DOES 1-10 would limit the maximum coverage offered to only the amount necessary to repair or replace the dwelling structure on the property at issue.  Thus, borrowers were forced to pay for a product which the Defendants never intended to fully deliver.

109.    As an example, if the appropriate cost of replacing the structure of a property is $400,000.00, and the amount of dwelling insurance purchased for that property is $500,000.00, that additional dwelling insurance of $100,000.00 provides no benefit to the borrower or even to BOA, but instead, solely serves to inflate the cost of the insurance which is charged to the borrower.

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 33
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

110.    In the case of Ms. Hong, the replacement cost of Ms. Hong's property was $400,000.00.

111.    Ms. Hong allowed her dwelling insurance to lapse. Defendant BOA procured an insurance policy from QBE effective from 10/21/2014 to 10/21/2015. The policy cost BOA $4,677.30.  BOA then charged to Ms. Hong's account for this amount and provided for dwelling coverage of $519,700.00. See Exhibit 8. While this amount had been the insured amount previously chosen by Ms. Hong for her privately procured coverage, the LPI policy did not provide similar coverage for the benefit of Ms. Hong and was substantially more expensive due to the LPI scheme BOA engaged in and outlined above.

112.    Following this same pattern, Defendant BOA procured a second insurance policy from QBE effective from 10/21/2015 to 10/21/2016. The policy cost BOA $4,677.30, which BOA charged to Ms. Hong's account and provided for dwelling coverage of $519,700.00.  Since these insurance policies would only cover replacement of the property at $400,000, the cost of the excessive coverage provided no benefit to her. This additional coverage was neither reasonable nor necessary, yet BOA charged Ms. Hong's account for this useless coverage. See Exhibit 9.

113.    This practice apparently stopped with respect to Ms. Hong's LPI when the value of the FPI was reduced beginning with the policy issued in October of 2016.

**XIX. ALLEGATIONS COMMON TO ALL CLAIMS**

114.    As described above,  BOA has undertaken a common practice and policy of unreasonably and illegally charging its financially distressed borrowers costs related to placing LPI on borrowers' homes. This common practice and policy is at the heart of this litigation and raises a uniform set of common questions of fact and law that unify the Class(es).

115.    Class members suffer harm by being forced to pay for unreasonable and unnecessary costs and coverage amounts on their properties in violation of their Deed of Trust in

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 34
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA  98101-3614
(206) 501-4446

precisely the same manner, while Defendants reap millions of dollars, each year, in ill-gotten profits. At the same time BOA has been unjustly enriched through the monopolistic relationship with QBE, National General, and other DOES 1-10 in exchange for reimbursement of expenses and the provision of services normally and customarily provided by the loan servicer at below market rates but then passing the full  costs on disproportionately to financially distressed borrowers.

116.    In addition to the "reasonable and necessary" clause found in each class members Deed of Trust, Mortgage lending and servicing entities are subject to the requirements of good faith and fair dealing, as set forth in the Uniform Commercial Code (adopted in relevant part by all fifty (50) States) - Obligation of good faith.  The Defendants routinely breach the "reasonable and necessary" clause of the common Deed of Trust and violate the obligation of good faith and fair dealing, when placing LPI on borrowers' properties as set forth in this complaint, thereby posing factual and legal issues which are common and uniform for all Washington and National Class members.

117.    As to the Washington Class, mortgage lending and servicing entities in Washington are subject to Washington's Consumer Protection Act, RCW 19.86 et seq., which prohibits the practice of placing LPI on borrowers' properties as described in this Second Amended Complaint, thereby posing a factual and legal issue which is common and uniform for all Washington State Class members.

118.    Mortgage lending and servicing entities in Washington are subject to the provisions of RCW 19.146.0201 and WAC 208-660-500 which prohibit the Defendants from directly or indirectly employing any scheme, device, or artifice to defraud or mislead borrowers or any person and to directly or indirectly engage in any unfair or deceptive practice toward any person.  Defendants LPI scheme as articulated in this Second Amended Complaint violates RCW

SECOND AMENDED CLASS ACTION COMPLAINT- Page 35
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA  98101-3614
(206) 501-4446

19.146.0201 and WAC 208-660-500 thereby posing a factual and legal issue which is common and uniform for all Washington State Class members.

119.    Plaintiff reserves the right to add other and further violations of law as discovery is conducted.

## XX. CLASS REPRESENTATION ALLEGATIONS

120.    Plaintiffs re-allege the foregoing paragraphs and incorporate them by reference.

121.    Plaintiffs bring this action pursuant to FRCP 23, on behalf of a Washington Class defined as all borrowers who acquired a mortgage or had their mortgage(s) serviced by BOA in the State of Washington from September 30, 2014 through the present where BOA placed LPI on the borrower's property, and a National Class defined as all borrowers who acquired a mortgage or had their mortgage(s) serviced by BOA from September 30, 2014 through the present where BOA placed LPI on the borrower's property.

122.    Membership in the Classes are so numerous as to make it impractical to bring all of the Class members before the Court. The exact number and identity of the Washington and National Class members are unknown. However, Plaintiff believes the Defendants sold and serviced thousands of mortgages to consumers and then placed LPI on the properties using the scheme articulated in this Class Action Complaint which add up, during the period of the statute of limitations, to thousands of Class members in each class.

123.    Plaintiff is a member of both the Washington Class and the National Class.

124.    There are numerous and substantial questions of law and fact common to the Washington and National Classes which control this litigation and which predominate over any individual issues. Included within the common questions are:

a)    Whether QBE/National General continues to provide free- or below-cost services and/or reimbursement of expenses which cost of such subsidy is included in charges by BOA to borrows styled as insurance.

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

b)      Whether BOA continues to obtain payments from its sale of Balboa to QBE that are tied to the financial success of QBE's and its successors' LPI business in violation of its fiduciary duty to its borrowers, and whether those constitute a kickback/improper payment from QBE to BOA that is assessed on borrowers with FPI.

c)      Whether BOA on its own or in conspiracy with QBE, National General, and other DOES 1-10 would place insurance on borrower's property with coverage which was higher than what was reasonable and necessary to protect the improvements on the property in violation of the Deed of Trust.

d)      Whether these practices violated a fiduciary duty owed by BOA to its borrowers.

e)      Whether this practice constituted an unfair or deceptive practice.

f)      Whether this practice is contrary to the public interest or any state laws.

g)      Whether this practice was a breach of the Deed of Trust.

h)      Whether this practice injured members of the class.

i)      Whether Defendants committed negligent supervision of their agents and employees.

j)      What damages are appropriate to remedy these injuries.

125.    Class Representative Plaintiff's claims are typical of the claims of the Washington and National Classes, and Class Representative has no interests adverse to the interests of the members of either Class.  Class Representative Plaintiff suffered from the same misconduct and damages as the rest of the Washington and National Classes.

126.    Class Representative Plaintiff will fairly and adequately protect the interests of the Classes.  Class Representative Plaintiff has retained counsel experienced and competent to prosecute class actions and complex litigation. Class Representative Plaintiff is willing to appear at depositions, assist counsel in the prosecution of the action, and seek the best interests of the Classes. Class Representative Plaintiff will give complete support to the vigorous prosecution of the Class' claims.

SECOND AMENDED CLASS ACTION COMPLAINT- Page 37
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

127.   Adjudications with respect to individual members of each Class would, as a practical matter, be dispositive of the interests of other members of each Class who are not parties to the adjudication and may impair and impede their ability to protect their interests.

128.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, the classes will continue to suffer damages and Defendants' violations of law will proceed without remedy.

129.   As a result of Defendants' wrongful business practices, improper conduct, and other wrongful acts and practices, Washington consumers have been harmed.

130.   Most individual members of each class have little ability to prosecute an individual action, due to the complexity of the issues involved in this litigation and the significant costs attendant to litigation on this scale.

131.   This class action will result in the orderly and expeditious administration of the Class members' claims.  Economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured.

132.   Class Counsel have substantial experience in class actions, having participated, and successfully resolved, multiple class actions.

133.   The circumstances of this action fulfill and meet the prerequisites, criteria, and requirements of a class action in accordance with FRCP 23.

## XXI. CLAIMS AND CAUSES OF ACTION

### Count 1 -Breach of Contract

134.   Plaintiff Sue Hong re-alleges and incorporates paragraphs above as if fully set forth herein and further alleges as follows.

135.   Upon information and belief, contracts, quasi contracts, contracts implied in fact, or contracts implied in law were formed between Defendants and Plaintiff.

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 38
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA  98101-3614
(206) 501-4446

136.    Defendants breached the provisions of the contract / Deed of Trust which limited the Defendants' conduct surrounding its LPI practices and policies to doing and paying "for whatever is reasonable or appropriate to protect the Lender's interest in the Property."

137.    Defendants were unjustly enriched by the practices outlined above.

138.    Defendant BOA based its right to assess charges styled as insurance to Ms. Hong's escrow account on provisions in the Deed of Trust which only permit it to charge reasonable costs to Ms. Hong.

139.    It was unreasonable to charge amounts styled as insurance that were in fact far greater than BOA's actual cost to protect the property serving as collateral for the loan.

140.    As a direct and proximate result of said breaches, Plaintiff suffered damages in an amount to be proven at trial.

141.    Defendants are liable to Plaintiff for reasonable attorney's fees and costs.

142.    Plaintiff Sue Hong on behalf of herself and all members of the Washington Class and National Class has complied with the Notice requirement contained in the Deed of Trust.

**Count 2- Violations of the Duty of Good Faith and Fair Dealing**

143.    Plaintiff Sue Hong re-alleges and incorporates paragraphs above as if fully set forth herein and further alleges as follows.

144.    The wrongful acts and representations of Defendants constitute violations of the duty of good faith and fair dealing which run with the contracts.

145.    As a proximate result of Defendants' violation of the duty of good faith and fair dealing, Plaintiff has been damaged.

146.    As a direct and proximate result of said breaches, Plaintiff suffered damages in an amount to be proven at trial.

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 39
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

147.    Defendants are liable to Plaintiff and class for reasonable attorney's fees and costs.

### Count 3- Negligent Supervision

148.    Plaintiff Sue Hong re-alleges and incorporates paragraphs above as if fully set forth herein and further alleges as follows.

149.    A principal conducting activities through agents is subject to liability for harm resulting from the actions of such agents if the principal is negligent or reckless in the supervision of the agents' activities.

150.    Defendants intentionally, recklessly, knowingly, and/or negligently authorized, endorsed, encouraged, instructed, promoted, and motivated the wrongful acts alleged herein.

151.    As a direct and proximate result of the wrongful acts herein alleged, Plaintiff and class members are damaged in an amount to be proven at trial.

152.    Defendants are liable to Plaintiff and class for reasonable attorney's fees and costs.

### Count 4- Breach of Fiduciary Duty -Against Defendant BOA

153.    Plaintiff Sue Hong re-alleges and incorporates paragraphs above as if fully set forth herein and further alleges as follows.

154.    Defendant BOA held funds in escrow on behalf of Plaintiff whose mortgage it services.  These funds are designated for the purpose of paying insurance premiums as they come due, and any excess funds are to be returned to Plaintiff under the terms of the mortgage agreement.

155.    Defendant BOA is in a fiduciary relationship with Plaintiff for two specific reasons: (1) because BOA receives a greater economic benefit from these transactions than it would from a typical escrow transaction; and (2) Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when Defendant BOA took it upon itself to manage borrower's escrow

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

account and then withdrew and/or charged money to Plaintiff's escrow account for force-placed insurance charges, not properly chargeable to Plaintiff. Defendant BOA violated this duty when it took advantage of an environment of reverse competition and entered a monopolistic agreement with QEB and DOES 1-10 in exchange for the provision of services normally and customarily provided by the loan servicer and then charged those costs disproportionately to Plaintiff and other financially distressed borrowers.

156. Defendant BOA breached its fiduciary duties to Plaintiff, by engaging in the LPI scheme outlined above.

157. These actions were undertaken by Defendant BOA in bad faith for its own benefit and were not intended to benefit the Plaintiff.

158. Plaintiff has suffered injury in the form of unnecessary and inflated escrow charges and/or loss of funds from her escrow account and increase in the principle balance of her loan.

159. Defendants are liable to Plaintiff and class for reasonable attorney's fees and costs.

## Count 5-Violations of Washington Consumer Protection Act (RCW §§ 19.86.010 et seq; 19.86.020; 19.86.090) (Washington Class Only)

160. On behalf of themselves and a Class of similarly situated Class members, Plaintiff re-alleges all of the paragraphs above and incorporates them by reference under this Count. Pursuant to RCW § 19.86.090, Plaintiff brings this private civil action.

161. As described herein, the Defendants' acts or practices are deceptive, and have the capacity to be deceptive, through misrepresentations, collusion, and withholding of material information from plaintiff and Washington consumers. Defendants withheld material information; made misrepresentations about the material terms of the mortgage/servicing agreements without the informed consent or knowledge of customers; and further failed to use due diligence and due process.

FRIEDMAN | RUBIN®
1109 First Avenue, Suite 501
Seattle, WA 98101-3614
(206) 501-4446

162.    As Described herein, Defendants' actions and practices are unfair as follows:

a. The plaintiff and class members are not in a reasonable position to avoid the injury caused by defendants' wrongful practices.

b. The practices of defendants caused substantial injury to hundreds or more customers by charging them for insurance, devoid of benefit to customers.

c. The plaintiff and class members were never in a position to refuse LPI.

d. The practice of overcharging insurance costs by BOA and QBE is not outweighed by countervailing benefits to consumers or the Defendant's competition.

e. The Defendants' acts or practices occur in commerce with the sale or service of a mortgage.

163.    The Defendants' acts or practices impact the public interest.  Numerous customers in the hundreds or thousands are affected by similar wrongful actions, similar withholding of material information, and similar misconduct. Defendants' practices have injured other persons including Plaintiff and have the capacity to injure and deceive other persons (RCW § 19.86.093(3)(a).

164.    The acts or practices described above constitute violations of the Consumer Protection Act ("CPA").  The CPA applies to conduct both before and after the sale and service of mortgages.

165.    Plaintiff seeks treble damages up to $25,000.00 per violation (RCW § 19.86.090); costs; and attorney's fees (RCW § 19.86.090) under this Count.

166.    As described herein, the Defendants' acts or practices are unfair and deceptive. As a direct and proximate result of said breaches, Plaintiff and consumers suffered damages in an amount to be proven at trial.

**Count 6- Conspiracy**

167.    Plaintiff Sue Hong re-alleges and incorporates paragraphs above as if fully set forth herein and further alleges as follows.

SECOND AMENDED CLASS ACTION COMPLAINT- Page 42
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

168.    Defendants entered into a conspiracy with each other and others still unknown to create and implement the LPI scheme described in this Second Amended Complaint, which scheme resulted in a breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty and violation of the Washington Consumer Protection Act.

## XV.  RELIEF REQUESTED

WHEREFORE, Plaintiff demands a jury trial on all triable claims and judgment as follows:

1.    Actual and statutory damages for the torts and wrongful acts committed by Defendants in an amount to be determined at trial.

2.    An injunction or injunctions preventing Defendants or anyone acting in concert with Defendants from perpetrating acts using the scheme outlined in this Second Amended Complaint.

3.    Restitution to each Class member of damages incurred by breach of contracts, quasi contracts, contracts implied in fact, or contracts implied in law, of an estimated amount of sums by which Defendants were unjustly enriched or on the basis of quantum meruit.

4.    Treble damages pursuant to the Washington Consumer Protection Act, up to the statutory limit.

5    An award of Plaintiff's reasonable costs and attorney's fees incurred in this action, pursuant to the Consumer Protection Act, RCW 19.86.090, or other laws as appropriate; and

6.    Any other award and relief the Court determines is just and equitable.

Dated December 16, 2020.

**BHARTI LAW GROUP, PLLC**

By:    *s/Harish Bharti*
Harish Bharti, WSBA # 23960
6701 37th Ave. NW
Seattle, WA 98117
206.789.4556
bhartilawyer@gmail.com

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 43
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA 98101-3614
(206) 501-4446

1

**LAW OFFICE OF JASON E. ANDERSON**

2

By:    *s/Jason Anderson*
Jason Anderson, WSBA # 32232

3

5355 Tallman Ave. NW, Ste. 207
Seattle, WA  98107

4

206.706.2882
jason@jasonandersonlaw.com

5

6

**FRIEDMAN | RUBIN** ®

7

By:    *s/Roger S. Davidheiser*
Roger S. Davidheiser, WSBA #18638

8

1109 First Avenue, Suite 501
Seattle, WA 98101

9

206.501.4446
rdavidheiser@friedmanrubin.com

10

11

12

Attorneys for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

SECOND AMENDED CLASS ACTION COMPLAINT-
Page 44
NO. 2:20-cv-01667-RSM, Hong v Bank of America

FRIEDMAN | RUBIN®
1109 FIRST AVENUE, SUITE 501
SEATTLE, WA  98101-3614
(206) 501-4446

# EXHIBIT 1

## *Chase Reinsurance Deals Draw New York Regulator's Attacks*

American Banker

May 21, 2012 Monday

Copyright 2012 SourceMedia LLC d/b/a Arizent. All Rights Reserved

**Section:** RISK MANAGEMENT; Vol. 177; No. 78

**Length:** 894 words

**Byline:** Jeff Horwitz

# Body

New York's Department of Financial Services hammered banks over their relationships with force-placed insurers in a Friday hearing, challenging JPMorgan Chase (JPM) officials on lucrative reinsurance arrangements that the Department suggested are tantamount to kickbacks.

"Hundreds of thousands of people are going to get foreclosed on, and Chase is profiting immensely from the reinsurance," DFS Superintendent Benjamin Lawsky said to JPMorgan Chase executives on Friday. "It just doesn't smell right."

Lawsky's comments came during the second of three days of hearings into the market for force-placed insurance. Homeowners with mortgages are generally required to carry policies on their homes, which serve as collateral for mortgage loans. Banks can "force" coverage on customers who allow their policies to lapse. Critics have charges that the premiums on the force-placed policies are excessive, in part because of fees paid by insurers to banks that refer them business. New York's DFS has been investigating the force-placed industry since last year, making it the first government body with subpoena power to extensively explore the market.

JPMorgan and other mortgage servicers' reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements.

Executives for JPMorgan's affiliated insurance agency disputed that receiving 75% of the force-placed insurance premium revenues borrowers pay had aligned the bank's interests against homeowners. "I could see how somebody would think that," conceded Robert Segnini a Vice President of Chase Insurance Agency.

Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS.

"Somebody's got to cover that risk, and Chase feels like it's positioned to do so," said Segnini. "The price to the customer wouldn't change."

DFS is also investigating commissions and other financial relationships between force-placed insurers and large mortgage servicers. In a Friday afternoon panel, the agency's staff grilled Bank of America (BAC) executives about its relationship with Balboa Insurance, which was a wholly owned subsidiary of the bank until its sale last year to QBE Insurance (QBE), an Australian conglomerate.

Balboa's sale provided Bank of America with financial incentives for writing more force-placed insurance and commits the bank to sending its force-placed insurance business to QBE for the next decade.

Chase Reinsurance Deals Draw New York Regulator's Attacks

Lawsky questioned whether this exclusivity arrangement limited competition and allowed QBE to charge B of A borrowers exorbitant rates.

Both B of A and JPMorgan expressed concern at the hearing about the cost of force-placed insurance for homeowners. JPMorgan's Segnini said the bank

has approached its force-placed insurer partner, Assurant (AIZ), "to see if they would be able to pass on rate relief to the borrower."

Assurant told the bank it couldn't lower its rates. But the issue may come up again soon, because Chase intends to solicit contracting proposals from force-placed insurance providers later this year.

The cost of coverage "is going to be a huge consideration," Segnini said.

Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns.

The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market. Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue.

Despite the lack of competition among underwriters, the DFS questioned whether banks were truly unable to demand lower force-placed insurance premiums for customers.

"I don't understand why you can't use the market power you have to go back to Assruant and say, 'go to the state and re-file lower rates,'" said Joy Feigenbaum, DFS's executive deputy superintendent for consumer fraud.

The agency acknowledged that New York's insurance regulators bear some responsibility for tolerating high rates. Feigenbaum noted that the insurance regulator that DFS replaced has not asked insurers to justify their rates for well over a decade, allowing the insurers to manage their own prices. New rate filings might address many DFS concerns, JPMorgan's Signini said.

"Let's do the math figure out what the loss ratio should be, re-file them with the state of New York and let's all move on," he said. "I think that's the answer."

New York's DFS is the first government agency to probe the force-placed market although others have expressed interest. During a break in the hearings on Friday, Lawsky told American Banker that the state's DFS had recently held preliminary talks with the federal Consumer Financial Protection Bureau and that the agency's staff seemed "very interested" in the force-placed insurance market.


*http://www.americanbanker.com*


**Load-Date:** May 18, 2012

---

**End of Document**

Cameron Taylor

# EXHIBIT 2

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423



20050729003434
PACIFIC NW TIT DT        30.00
PAGE001 OF 011
07/29/2005 14:55
KING COUNTY, WA

Assessor's Parcel or Account Number: 1234
Abbreviated Legal Description:
PTN. TRACT 74, DES MOINES TWO ACRE TRACTS, VOL. 10, PG. 67

Full legal description located on page    [Include ......... this and page]    HONG        S

Trustee:
LANDSAFE TITLE OF WASHING    610                D2    001    002
                                          Additional G.......

[Space Above This Line For Recording Data]

[Doc ID #]

# DEED OF TRUST

MIN 100015



FILED BY PNWT

578538-2

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated  JULY 25, 2005    , together with all Riders to this document.
(B) "Borrower" is
SUE HONG, AND JOON HONG, WIFE AND HUSBAND

Borrower is the trustor under this Security Instrument.
(C) "Lender" is
COUNTRYWIDE HOME LOANS, INC.
Lender is a CORPORATION
organized and existing under the laws of NEW YORK

WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

  -6A(WA) (0012).01    CHL (08/02)(d)    VMP MORTGAGE FORMS - (800)521-7291
CONV/VA

Page 1 of 11            Initials: _SH_  JH

Form 3048 1/01

* 2 3 9 9 1 *

* 1 0 9 6 2 0 7 8 0 0 0 0 0 0 0 2 0 0 6 A *

DOC ID #: ████████████████

Lender's address is
4500 Park Granada, Calabasas, CA 91302-1613
**(D) "Trustee"** is
LANDSAFE TITLE OF WASHINGTON
2707 COLBY AVENUE SUITE 1118, EVERETT, WA 98201
**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F) "Note"** means the promissory note signed by Borrower and dated  JULY 25, 2005          . The Note states that Borrower owes Lender
SIX HUNDRED THIRTY THREE THOUSAND THREE HUNDRED and 00/100

Dollars (U.S. $ 633,300.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  AUGUST 01, 2035          .
**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(M) "Escrow Items"** means those items that are described in Section 3.
**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| COUNTY | of | KING | : |
|---|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

Initials: _JH_

DOC ID #: ████████████

THE NORTH 60 FEET OF THE EAST HALF OF THE EAST HALF OF TRACT 74, DES MOINES TWO ACRE TRACTS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 10 OF PLATS, PAGE 67, IN KING COUNTY, WASHINGTON.

which currently has the address of
            22515 10TH AVENUE SOUTH, DES MOINES
                        [Street/City]

Washington   98198    ("Property Address"):
            [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the

Initials: JH

DOC ID #:

late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees, and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Initials: JH

DOC ID #:

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent

Initials: _JH_

DOC ID #: ▓▓▓▓▓▓▓▓

the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Initials: JH  JH

DOC ID #: ▮▮▮▮▮▮▮▮

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

Initials: _____

DOC ID #: ████████

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

Initials: _AB_ _JH_

DOC ID #: ██████████

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous

Initials: ___

DOC ID #: ▓▓▓▓▓▓▓▓

Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

**24. Substitute Trustee.** In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Use of Property.** The Property is not used principally for agricultural purposes.

**26. Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

Initials: _JH_

DOC ID #: ███████████

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _____ (Seal)
                              SUE HONG                -Borrower

_____    _____ (Seal)
                              JOON HONG               -Borrower

                             _____ (Seal)
                                                      -Borrower

                             _____ (Seal)
                                                      -Borrower


**STATE OF WASHINGTON**
**County of** *King*                    } ss:

        On this day personally appeared before me

        *Sue Hong and Joon Hong*

to me known to be the individual(s) described in and who executed the within and foregoing instrument, and acknowledged that he/she/they signed the same as his/her/their free and voluntary act and deed, for the uses and purposes therein mentioned.

        GIVEN under my hand and official seal this *25th* day of *July, 2005*.



                             _____
                             Notary Public in and for the State of Washington, residing at
                             *Fed Way*
                             My Appointment Expires on *5/19/06*

# EXHIBIT 3

After Recording Return To:

_____

_____

_____

_____

_____**[Space Above This Line For Recording Data]**_____

# DEED OF TRUST

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)**    **"Security Instrument"** means this document, which is dated _____, _____, together with all Riders to this document.

**(B)**    **"Borrower"** is _____. Borrower is the trustor under this Security Instrument.

**(C)**    **"Lender"** is _____. Lender is a _____ organized and existing under the laws of_____. Lender's address is _____ _____. Lender is the beneficiary under this Security Instrument.

**(D)**    **"Trustee"** is _____.

**(E)**    **"Note"** means the promissory note signed by Borrower and dated _____, _____. The Note states that Borrower owes Lender _____ Dollars (U.S. $_____) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than _____.

**(F)**    **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)**    **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☐ Planned Unit Development Rider ☐ Other(s) [specify] _____
☐ 1–4 Family Rider ☐ Biweekly Payment Rider

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** **"Escrow Items"** means those items that are described in Section 3.

**(M)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the _____ of _____ :
  [Type of Recording Jurisdiction]                [Name of Recording Jurisdiction]

which currently has the address of _____
                                                                    [Street]
_____, California _____ ("Property Address"):
               [City]                                      [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:
1.      **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3.  Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice

provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

    **2.**     **Application of Payments or Proceeds.**   Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

    If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

    Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

    **3.**     **Funds for Escrow Items.**   Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment

of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.    Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while

those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.      Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.     Occupancy.**     Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.     Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient

to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.    Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.    Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.    Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.    Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.  If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to

Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a)    **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b)    **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11.    **Assignment of Miscellaneous Proceeds; Forfeiture.**    All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for

damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.    Borrower Not Released; Forbearance By Lender Not a Waiver.**  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.    Joint and Several Liability; Co-signers; Successors and Assigns Bound.**  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.  Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.  The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.    Loan Charges.**  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for

under the Note).  Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15.    Notices.**  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.  Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means.  Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise.  The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender.  Borrower shall promptly notify Lender of Borrower's change of address.  If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower.  Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.  If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16.    Governing Law; Severability; Rules of Construction.**  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17.    Borrower's Copy.**  Borrower shall be given one copy of the Note and of this Security Instrument.

**18.    Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in

accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19.    Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b ) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20.    Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time

period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right**

to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23.    **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24.    **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25.** **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____   _____ (Seal)
                                                                    - Borrower

_____   _____ (Seal)
                                                                    - Borrower

_____**[Space Below This Line for Acknowledgment]**_____

# EXHIBIT 4

After Recording Return To:

_____

_____

_____

_____

_____**[Space Above This Line For Recording Data]**_____

# MORTGAGE

## WORDS USED OFTEN IN THIS DOCUMENT

**(A)** **"Security Instrument."**  This document, which is dated _____,
_____, together with all Riders to this document, will be called the "Security Instrument."
**(B)** **"Borrower."** _____,
whose address is _____
_____ sometimes will be called "Borrower" and sometimes simply "I" or "me."
**(C)** **"Lender."** _____
will be called "Lender." Lender is a corporation or association which exists under the laws of
_____. Lender's address is _____
_____ .
**(D)** **"Note."** The note signed by Borrower and dated _____,
_____, will be called the "Note."  The Note shows that I owe Lender _____
_____ Dollars (U.S. $_____)
plus interest and other amounts that may be payable.  I have promised to pay this debt in Periodic
Payments and to pay the debt in full by _____, _____.
**(E)** **"Property."**  The property that is described below in the section titled "Description of
the Property," will be called the "Property."
**(F)** **"Loan."**  The "Loan" means the debt evidenced by the Note, plus interest, any
prepayment charges and late charges due under the Note, and all sums due under this Security
Instrument, plus interest.
**(G)** **"Sums Secured."**  The amounts described below in the section titled "Borrower's
Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

**(H)** **"Riders."** All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider            ☐ Second Home Rider
☐ Balloon Rider              ☐ Planned Unit Development Rider  ☐ Other(s) [specify] _____
☐ 1-4 Family Rider           ☐ Biweekly Payment Rider

**(I)** **"Applicable Law."** All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

**(J)** **"Community Association Dues, Fees, and Assessments."** All dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

**(K)** **"Electronic Funds Transfer."** "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** **"Escrow Items."** Those items that are described in Section 3 will be called "Escrow Items."

**(M)** **"Miscellaneous Proceeds."** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in, Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

**(N)** **"Mortgage Insurance."** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** **"Periodic Payment."** The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

**(P)** **"RESPA."** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY**

I mortgage, grant and convey the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

    (A)    Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

    (B)    Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

    (C)    Keep all of my other promises and agreements under this Security Instrument and the Note.

**DESCRIPTION OF THE PROPERTY**

I give Lender rights in the Property described in (A) through (G) below:

    (A)    The Property which is located at _____,

                                   [Street]

_____, New York _____.

           [City, Town or Village]                     [Zip Code]

This Property is in _____ County. It has the following legal description:

    (B)    All buildings and other improvements that are located on the Property described in subsection (A) of this section;

    (C)    All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

    (D)    All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

    (E)    All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

    (F)    All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

    (G)    All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE SECURITY INSTRUMENT**

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

**COVENANTS**

I promise and I agree with Lender as follows:

     **1.**     **Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

     Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

     Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

**2.     Application of Borrower's Payments and Insurance Proceeds.**     Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.

Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows:  First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

**3.     Monthly Payments For Taxes And Insurance.**

**(a)     Borrower's Obligations**.  I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1)     The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property.  Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2)     The leasehold payments or ground rents on the Property (if any);

(3)     The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4)     The premium for Mortgage Insurance (if any);

(5)     The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6)     If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items.  The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

**(b)    Lender's Obligations.** Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

    **(c)    Adjustments to the Escrow Funds**.  Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold.  If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

    If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary.  I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

    When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

    **4.    Borrower's Obligation to Pay Charges, Assessments And Claims.**  I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument.  I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property.  If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument.  In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

    I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument.  However, this Security Instrument does not require me to satisfy a superior Lien if:  (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security Instrument is superior to the Lien held by that Person.  If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien.  Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

    Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

    **5.    Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.**  I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property.  The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender.  What Lender requires under the last sentence can change during the term of the Loan.  I may choose the insurance company, but my choice is subject to Lender's right to disapprove.  Lender may not disapprove my choice unless the disapproval is reasonable.  Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone

determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.    Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7.    Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

**(a)    Maintenance and Protection of the Property**. I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

**(b)    Lender's Inspection of Property**. Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

**8.    Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation

of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9.    Lender's Right to Protect Its Rights in The Property.**  If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10.    Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve.

Lender can no longer require Loss Reserve payments if:  (a) Mortgage Insurance coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument.  Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed.  Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.  These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity, may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses.  If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."

It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has – if any – regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law.  These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

**11.    Agreements About Miscellaneous Proceeds; Forfeiture.**  All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction.  However, the inspection will be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is

completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12.    Continuation of Borrower's Obligations And of Lender's Rights.**

**(a)    Borrower's Obligations**.  Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments.  Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so.  Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

**(b)    Lender's Rights**.  Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future.  Even if:  (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13.    Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.**  If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument.  Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together.  This means that any one of us may be required to pay all of the Sums Secured.  However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument.  Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing.  Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14.    Loan Charges.**  Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee.  Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits:  (a) any such loan charge will be

reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

      **15.    Notices Required under this Security Instrument.**  All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

      **16.    Law That Governs this Security Instrument; Word Usage.**  This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

      As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

      **17.    Borrower's Copy.**  I will be given one copy of the Note and of this Security Instrument.

      **18.    Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

      If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the

required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

     **19.**    **Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

     (a)    I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

     (b)    I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

     (c)    I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

     (d)    I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

     Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

     If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

     **20.**    **Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

     The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21.    Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies

me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

## NON-UNIFORM COVENANTS

I also promise and agree with Lender as follows:

**22.    Lender's Rights If Borrower Fails to Keep Promises and Agreements. Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument.  Lender may do this without making any further demand for payment.  This requirement is called "Immediate Payment in Full."**

**If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold.  At this sale Lender or another Person may acquire the Property.  This is known as "Foreclosure and Sale."  In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.**

**Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:**

**(a)    I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;**

**(b)    Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:**

**(1)    The promise or agreement that I failed to keep or the default that has occurred;**

**(2)    The action that I must take to correct that default;**

**(3)    A date by which I must correct the default.  That date will be at least 30 days from the date on which the notice is given;**

**(4)    That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;**

**(5)    That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and**

**(6)    That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and**

(c)    **I do not correct the default stated in the notice from Lender by the date stated in that notice.**

23.    **Lender's Obligation to Discharge this Security Instrument.**  When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied.  I will pay all costs of recording the discharge in the proper official records.  I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires.  Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

24.    **Agreements about New York Lien Law.**  I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law.  This means that I will:  (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose.  The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

25.    **Borrower's Statement Regarding the Property [check box as applicable].**

☐    This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

☐    This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

☐    This Security Instrument does not cover real property improved as described above.

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 19 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses:

_____    _____ (Seal)
                                                                           - Borrower


_____    _____ (Seal)
                                                                           - Borrower

_____**[Space Below This Line For Acknowledgment]**_____

# EXHIBIT 5

After Recording Return To:

_____

_____

_____

_____


_____**[Space Above This Line For Recording Data]**_____

# DEED OF TRUST

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)**      **"Security Instrument"** means this document, which is dated _____, _____, together with all Riders to this document.
**(B)**      **"Borrower"** is _____.   Borrower is the trustor under this Security Instrument.
**(C)**      **"Lender"** is _____.   Lender is a _____ organized and existing under the laws of _____.  Lender's address is _____ _____.  Lender is the beneficiary under this Security Instrument.
**(D)**      **"Trustee"** is _____.
**(E)**      **"Note"** means the promissory note signed by Borrower and dated _____, _____.  The Note states that Borrower owes Lender _____ Dollars (U.S. $_____) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than _____.
**(F)**      **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G)**      **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H)**      **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider       ☐ Condominium Rider                      ☐ Second Home Rider
☐ Balloon Rider                    ☐ Planned Unit Development Rider   ☐ Other(s) [specify] _____
☐ 1-4 Family Rider               ☐ Biweekly Payment Rider

**WASHINGTON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**        Form 3048      1/01      *(page 1 of 16 pages)*

**(I)**    **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)**    **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)**    **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)**    **"Escrow Items"** means those items that are described in Section 3.

**(M)**    **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)**    **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)**    **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)**    **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)**    **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the _____ of _____:
                      [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]

which currently has the address of _____

                                                       [Street]

_____, Washington _____ ("Property Address"):
        [City]                               [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.    **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in

the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.    Application of Payments or Proceeds.**  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:   (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge.  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.    Funds for Escrow Items.**  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10.  These items are called "Escrow Items."  At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice

given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.    Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.     Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either:  (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is

completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds.  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such insurance proceeds shall be applied in the order provided for in Section 2.

       If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property.  Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

       **6.**    **Occupancy.**   Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

       **7.**    **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.    Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.    Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.    Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.  If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.  If substantially equivalent Mortgage Insurance

coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect.  Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance.  Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve.  Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law.  Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed.  Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.  These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."  Further:

**(a)    Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b)    Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law.  These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11.    Assignment of Miscellaneous Proceeds; Forfeiture.**  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value.  Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.   "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.    Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.    Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.    Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note).  Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

     **15.    Notices.**  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.  Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise.  The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender.  Borrower shall promptly notify Lender of Borrower's change of address.  If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure.  There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower.  Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.  If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

     **16.    Governing Law; Severability; Rules of Construction.**  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

     As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

     **17.    Borrower's Copy.**  Borrower shall be given one copy of the Note and of this Security Instrument.

**18.    Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by  Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19.    Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument.  Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20.    Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of

the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21.  Hazardous Substances.**  As used in this Section 21:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials;  (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other

remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

**22.    Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future.  The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law.  If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold.  Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require.  After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines.  Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale.  Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied.  The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein.  Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.**

**23.    Reconveyance.**    Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee.  Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it.  Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

**24.    Substitute Trustee.**    In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act.  Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25.    Use of Property.**    The Property is not used principally for agricultural purposes.

**26.    Attorneys' Fees.**    Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____(Seal)
                                                                      - Borrower


_____        _____(Seal)
                                                                      - Borrower

_____**[Space Below This Line For Acknowledgment]**_____

# EXHIBIT 6

Prepared by: KELLI ADAM



# NOTE

JULY 25, 2005        FEDERAL WAY        WASHINGTON
[Date]        [City]        [State]

.    22515 10TH AVENUE SOUTH, DES MOINES, WA 98198
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 633,300.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
COUNTRYWIDE HOME LOANS, INC.
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   5.750 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the   FIRST        day of each month beginning on
SEPTEMBER 01, 2005 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   AUGUST 01, 2035      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219
or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ 3,695.77     .

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

### 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 6. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of   FIFTEEN      calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

Initials: _AM_

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Page 1 of 2

 -5N (0207).01     CHL (010/04)(d)     VMP Mortgage Solutions, Inc. (800)521-7291        Form 3200 1/01

* 2 3 9 9 1 *            



LOAN #:

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
SUE  HONG                        -Borrower                                           -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                           -Borrower

*[Sign Original Only]*

# EXHIBIT 7

# FYI Financial News

Division of Consumer Services Newsletter

**Winter 2017**

# Over-Insurance: Requesting That A Borrower Over-Insure Their Property Violates the Law

The Enforcement Unit has received information that some lenders, brokers, and mortgage loan originators (MLOs) are requiring consumers to increase their homeowner's insurance to cover the entire mortgage amount rather than just the replacement cost of the improvements. While requiring an applicant to do so is prohibited, as the consumer might pay hundreds more in additional premiums for zero additional coverage, it is important that our licensees know that requesting that a consumer over-insure their property is a violation of the law.

Title 48 of the Revised Code of Washington (RCW) (http://apps.leg.wa.gov/rcw/default.aspx?Cite=48) governs all insurance, insurance transactions, and persons having to do with insurance in Washington. Chapter RCW 48.27 (http://app.leg.wa.gov /RCW/default.aspx?cite=48.27) , dealing with property insurance, specifically prohibits over-insurance on property, and specifies that over-insurance may exist, and is prohibited, "in those instances when insured value is for improvements and land." See, RCW 48.27.010(1) (http://app.leg.wa.gov/RCW/default.aspx?cite=48.27.010) .

In some geographic areas here in Washington the current market for real estate has been skyrocketing, with the value of the improvements (the home) lagging behind the increased value of the land (including the view, neighborhood, and civic improvements). When a consumer in that situation seeks financing, the mortgage loan amount is going to be driven by the value of the land as much as by the value of the house. A lender may want to condition making the loan on the consumer obtaining homeowner's insurance in an amount that covers the entire mortgage, rather than just an amount to cover the replacement cost of the house.

Not only is it a violation for an insurance company or agent to issue such a policy, it is a violation for any person, including a lender, broker, or MLO to even request over-insurance. See, RCW 48.27.010(3) and (4) (http://app.leg.wa.gov /RCW/default.aspx?cite=48.27.010) .

While any insurance company or agent found to have been involved in this conduct would be subject to enforcement action by the Office of the Insurance Commissioner (OIC) (https://www.insurance.wa.gov (https://www.insurance.wa.gov) ), any licensed consumer loan company, mortgage broker, or employee of a licensed consumer loan company or mortgage broker, including MLOs, would be subject to enforcement action by the Department of Financial Institutions.

Over-insurance is classified by the OIC as an Unfair Practice and Fraud pursuant to RCW 48.30.260 (http://app.leg.wa.gov /RCW/default.aspx?cite=48.30.260) . As any violation of an applicable state law is also a violation of the Consumer Loan Act and Mortgage Broker Practices Act (See, RCW 31.04.027 (13) (http://apps.leg.wa.gov/rcw/default.aspx?cite=31.04&full=true#31.04.027) and RCW

19.146.0201(11) (http://apps.leg.wa.gov/rcw/default.aspx?cite=19.146&full=true#19.146.0201) , respectively), the Department of Financial Institutions would likewise charge any person requesting or compelling over-insurance with employing a scheme, device, or artifice to defraud or mislead any borrower, and engaging in any unfair or deceptive practice toward any person.

If you or someone you know has engaged in, or been a victim of this conduct, please contact the Consumer Services Division's Enforcement Unit at (360) 725-7842.

---

We Want Newsletter Feedback

Take Our 3 Question Survey (https://www.surveymonkey.com/r/H3DSRC5)

See enforcement actions (http://www.dfi.wa.gov/enforcement-actions) taken by the Division of Consumer Services.

Winter 2017 Division of Consumer Services Newsletter

Contact us at: dcs@dfi.wa.gov (mailto:dcs@dfi.wa.gov) or (360) 902-8703

# EXHIBIT 8

**QBE INSURANCE CORPORATION**
88 Pine Street, 16th Floor
New York, NY 10005

**Toll Free Customer Service: (866) 265-3321**
NON-HELOC
100 N TRYON ST
CHARLOTTE, NC  28255-0001

**Home Office:  c/o CT Corporation System**
116 Pine Street, Suite 320
Harrisburg, PA 17101

## Additional Named Insured Certificate

LOAN NUMBER: 9046-0000-    0780

**ADDITIONAL NAMED INSURED**
SUE HONG
22515 10TH AVE S
DES MOINES, WA  98198-6914

NOTIFICATION DATE: 10/28/2014

**NAMED INSURED MORTGAGEE**
BANK OF AMERICA, N.A.
NON-HELOC
100 N TRYON ST
CHARLOTTE, NC  28255-0001

| | | Amount of Insurance | Premium |
|---|---|---|---|
| POLICY NUMBER Q-5644337 | Dwelling | $519,700.00 | $4,677.30 |
| POLICY TERM: | Personal Property Endorsement | $0.00 | $0.00 |
| FROM  10/21/2014    TO 10/21/2015 | Additional Living Expense Endorsement | $0.00 | $0.00 |
| ☐ NOON    ☒ 12:01am | Other Endorsements | | $0.00 |
| Standard Time at your Residence Address | Deductible - per loss occurrence | | |
| | Property is VACANT at time of loss | $1,000.00 | |
| | Vandalism & Malicious Mischief | $1,000.00 | |
| | All Other Covered Losses | $1,000.00 | |

| | | Limit of Liability | Premium |
|---|---|---|---|
| PROPERTY LOCATION | | | |
| 22515 10TH AVENUE SOUTH | Personal Liability Endorsement | $0.00 | $0.00 |
| DES MOINES WA  98198 | Medical Payments | $0.00 | $0.00 |
| | WA REGULATORY SURCHARGE | 0.125% | $5.85 |
| ENDORSEMENTS ATTACHED AND FORMING A PART OF THE POLICY PRV-5 (01-13), RP1200 (0109), RP1211 (0109), IL1701 (0413), RP1546 (0114), RP1480 (0109), IL1705 (0109), IL1401 (0109) | TOTAL CHARGES | | $4,683.15 |

### NOTICE TO ADDITIONAL NAMED INSURED (BORROWER):

**THIS INSURANCE WILL NOT PROVIDE COVERAGE FOR AN AMOUNT GREATER THAN THE AMOUNT OF INSURANCE SHOWN ABOVE. THIS POLICY MAY NOT FULLY PROTECT YOUR INTEREST IN THE PROPERTY LISTED. THIS POLICY DOES NOT PROVIDE PERSONAL PROPERTY COVERAGE OR LIABILITY COVERAGE, UNLESS INDICATED ABOVE. PLEASE REFER TO THE ATTACHED FORM(S) FOR A FULL DESCRIPTION OF THE TERMS AND LIMITATIONS OF THIS COVERAGE.**

**For Customer Service questions, please call our toll free Customer Service Number at: (866) 265-3321**

**To report a claim, please contact our Claim Department at 1-800-323-7466
or, you may report a new claim using our website at www.qbefirst.com**

RP1156 0209

**Personal Property and Personal Liability Coverages -** We will cover your personal property, additional living expense or Personal Liability under this policy ONLY if an "Amount of Insurance" or "Limit of Liability" and a premium are shown above. Coverage will be provided according to the terms and conditions of the endorsements attached to this policy. If no "Amount of Insurance" or "Limit of Liability" is shown and no premium is shown no coverage will be provided for Personal Property, Additional Living Expense or Personal Liability. These endorsements are available only for a residence that is owner occupied. **These coverages are void if the residence is vacant or occupied by someone other than the Additinal Named Insured shown above at the time of loss.**

**DEDUCTIBLES:** Please refer to the deductibles shown above for the coverage provided by this policy.

Subject to the terms and provisions of this policy and the coverage forms and endorsements attached hereto, it is agreed that the insurance applies to the property described above and to any person shown as an Additional Named Insured with respect to the property, subject to the following additional provisions:

(a) The above Named Insured Mortgagee is authorized to advance all funds to be recovered from the Additional Named Insured(s) for the insurance afforded.

(b) Loss, if any, shall be adjusted with and payable to the above Named Insured Mortgagee and the Additional Named Insured(s) as their interest may appear, either by a single instrument so worded or by separate instruments payable respectively to the Named Insured Mortgagee and the Additional Named Insured(s), at the company's option.

**RP1156 0209**                                                                                                    **Page 2 of 2**

# NOTICE OF QBE® PRIVACY POLICIES AND PRACTICES

| FACTS | WHAT DOES QBE DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Your privacy is important to us. At QBE, we know that you have an interest in how we collect, keep, and use customer information. |
| What? | At QBE, we collect, keep and use information about our customers to serve their insurance needs. QBE and our agents may collect the following information about you and people covered under your policy:<br>• Information included on your applications or other forms. (For example, name, address, and Social Security number).<br>• Information about your transactions with us or our affiliates. (For example, services purchased and payment history).<br>• Information from consumer reporting agencies and insurance-support organizations. (For example, credit relationships and history, motor vehicle reports and claims history).<br>• Information from other sources. (For example, medical information and demographic information).<br>• Information from visits to the QBE web site. |
| How? | All financial companies need to share customers' information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' information; the reasons QBE chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does QBE share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes** -- such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For joint marketing with other financial companies** | No | We don't share |
| **For our affiliates' everyday business purposes** -- information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes** -- information about your creditworthiness | No | We don't share |
| **For affiliates to market to you** -- to offer our products and services to you. | Yes | No |
| **For nonaffiliates to market to you** | No | We don't share |

| Questions? | Please Contact: | QBE Americas, Inc.<br>Attn: Privacy Official<br>Corporate Legal Department<br>One General Drive<br>Sun Prairie, WI  53596<br>1.800.362.5448 |
|---|---|---|

| Who we are | |
|---|---|
| Who is providing this notice? | QBE U.S. legal entities that use the names listed on page 3 of this Notice. |

## What we do

| | |
|---|---|
| How does QBE protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| How does QBE collect my personal information? | If we need to confirm or obtain additional information about our customers, we may contact outside sources. These sources may include agents, brokers, insurance support organizations, consumer reporting agencies, medical providers and government agencies. The information we collect from these outside sources may include claims history, employment information and medical reports. Information obtained from outside sources may be kept by these outside sources and disclosed to other persons, as permitted by law. |
| Why can't I limit all sharing? | Federal law gives you the right to limit some but not all sharing related to:<br>• affiliates' everyday business purposes -- information about your credit worthiness<br>• affiliates from using your information to market to you<br>• nonaffiliates to market to you<br>State laws and individual QBE companies may give you more rights to limit sharing. |

## Definitions

| | |
|---|---|
| Affiliates | Companies related by common ownership or control. They can be insurance and non-insurance companies. Our affiliates include companies listed on page 3 of this Notice. |
| Nonaffiliates | Companies not related by common ownership or control. They can be insurance and non-insurance companies. |
| Third Parties | QBE carefully chooses service providers to help us provide quality insurance services to our customers. We are careful to protect customer privacy when we share information with them. We may share customer information with the types of third parties listed below<br>• Financial service providers. (For example, insurance agents).<br>• Hospitals, medical clinics or physicians.<br>• Adjusters, appraisers, investigators and attorneys (To investigate or settle a claim involving you).<br>• Insurance-support organizations that help detect and prevent insurance crimes or fraudulent claims (such as the National Insurance Crime Bureau). Information collected by such organizations may be kept by them and later shared with others who use these reports.<br>• People that conduct actuarial or underwriting studies.<br>• Companies that perform services for us or on our behalf. (For example, vendors we hire to respond to customer requests or to maintain or develop software for us).<br><br>We require third parties to comply with strict standards regarding security and confidentiality of customer information. They are not permitted to release customer information or use it for their own purposes. Third parties are also not allowed to sell any customer information we share with them to any other party.<br><br>There may be times when we are required by law to disclose information about you to nonaffiliated third parties. For example, we may disclose information in response to a subpoena. We may share information to help detect or prevent fraud. We may have to give information to law enforcement or governmental agencies. We also may share information if you give us written permission first.<br>We do not sell or share customer information to or with any party outside of QBE for purposes of independently selling their products to our customers. |

## Other important information

**How You Can Review Recorded Information About You:**

People covered under your policy have the right to review information about them in our files. They may write us at the address shown on this notice if they want to know what information we have on file. We will need their complete name, address, date of birth, and all your policy numbers. They will need to tell us what information they would like to receive or view. We will act on their request within 30 days of receiving it. We will let them know the nature of the information about them in our files. We will tell them with whom we have shared this information in the past two years. We will also give them the name and address of any consumer reporting agency that prepared a report about them in our files. They can contact the consumer reporting agency to get a copy of that report.

If they would prefer to view and copy the information in the file in person, they will need to let us know in their request.

**If You Disagree With Our Records:**

A person covered under your policy should contact us if they think any of our information is incorrect. They should tell us what is wrong and why. They may ask us to correct, amend or delete it. Within 30 days of receiving their request, we will change their information in our files or let them know that we refused to change their information.

If we make any changes to their information, we will let them know of those changes. We will also let the parties listed below know of those changes.

- Any party that may have, in the past 2 years, been given such information.
- Any insurance-support organization that we have given the information to within the past 7 years.
- Any insurance-support organization that gave us the information.
- Consumer Reporting Agencies (CRAs).

If we do not make changes, we will give them the reasons why and let them know of their right to file a statement. Their statement should tell us what they think is the correct information. They should also tell us why they disagree with our refusal. Their statements will be kept in their file and given to anyone that reviews the information. If we need to disclose the disputed information, we will mark the matter(s) in dispute and include their statement(s).

**Privacy Policy Changes:** We will notify you if we make changes to our privacy policy. We may make changes to comply with applicable laws or to conform to our current business practices. QBE reserves the right to change its privacy policies at any time.

## QBE U.S. legal entities

**This notice is being provided on behalf of the following QBE affiliates:**

QBE Insurance Corporation
QBE Specialty Insurance Company
Praetorian Insurance Company

North Pointe Insurance Company
Stonington Insurance Company

QBE is a registered service mark of QBE Insurance Group Limited.

# Dwelling Hazard Coverage Form

## Table of Contents

|  | Page # |
|---|---|
| AGREEMENT ................................................. | 1 |
| DEFINITIONS ................................................. | 1 |
| COVERAGES ................................................. | 1 |
| OTHER COVERAGES ................................................. | 1-2 |
| PERILS INSURED AGAINST ................................................. | 2-3 |
| GENERAL EXCLUSIONS ................................................. | 3 |
| CONDITIONS ................................................. | 3-6 |

**Residential Property**

# DWELLING HAZARD COVERAGE FORM

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

In this policy, "you" and "your" refer to the "Named Insured Mortgagee" and the "Additional Named Insured" shown in the Declarations. "We", "us" and "our" refer to the Company providing this insurance.

## COVERAGES

This insurance applies to the Described Location, Coverages for which an Amount of Insurance is shown and Perils Insured Against for which a Premium is stated.

### COVERAGE A - Dwelling

We cover:

1. the dwelling on the Described Location shown in the Declarations, used principally for dwelling purposes not to exceed four (4) living units, including, but not limited to, individually owned townhouses or permanently situated mobile homes;

2. structures attached to the dwelling;

3. materials and supplies located on or next to the Described Location used to construct, alter or repair the dwelling or other structures on the Described Location; and

4. if not otherwise covered in this policy, building equipment, and outdoor equipment used for the service of and located on the Described Location.

This coverage does not apply to land, including land on which the dwelling is located.

### COVERAGE B - Other Structures

We cover other structures on the Described Location, set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

This coverage does not apply to land, including land on which the other structures are located.

We do not cover other structures:

1. used in whole or in part for commercial, manufacturing or farming purposes; or

2. rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

## OTHER COVERAGES

1. **Other Structures**. You may use up to 10% of the Coverage A amount of insurance for loss by a Peril Insured Against to other structures described in Coverage B.

   Use of this coverage does not reduce the Coverage A amount of insurance for the same loss.

2. **Debris Removal**. We will pay your reasonable expense for the removal of:

   a. debris of covered property if a Peril Insured Against causes the loss; or

   b. ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

   Debris removal expense is included in the amount of insurance applying to Coverage A.

3. **Reasonable Repairs**. In the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage. If the measures taken involve repair to other damaged property, we will pay for those measures only if that property is covered under this policy and the damage to that property is caused by an applicable Peril Insured Against.

This coverage:

a. does not increase the amount of insurance that applies to the covered property;

b. does not relieve you of your duties, in case of a loss to covered property, as set forth in Condition 4.b.

Reasonable Repairs is included in the amount of insurance applying to Coverage A.

4. **Collapse**. We insure for risk of direct damage physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

(1) hidden decay;

(2) hidden insect or vermin damage;

(3) weight of contents, equipment, animals or people;

(4) weight of rain which collects on a roof;

(5) use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items (1),(2),(3),(4) or (5) unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking or shrinking.

This coverage does not increase the amount of insurance applying to the damaged covered property.

## PERILS INSURED AGAINST

### COVERAGE A - DWELLING

### COVERAGE B - OTHER STRUCTURES

We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property; however, we do not insure loss:

1. involving collapse, other than as provided in Other Coverages 4.;

2. caused by:

a. freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion applies only while the dwelling is being constructed;

b. freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

(1) fence, pavement, patio or swimming pool;

(2) foundation, retaining wall or bulkhead; or

(3) pier, wharf or dock;

c. theft of property not part of a covered building or structure;

d. theft in or to a dwelling or structure under construction;

e. wind, hail, ice, snow or sleet to outdoor radio or television antennas and aerials including lead-in wiring, masts or towers;

f. constant or repeated seepage or leakage of water or steam over a period of weeks, months or years from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance;

g. (1) wear and tear, marring, deterioration;

(2) inherent vice, latent defect, mechanical breakdown;

(3) smog, rust or other corrosion, mold, wet or dry rot;

(4) smoke from agricultural smudging or industrial operations;

(5) discharge, dispersal, seepage, migration, release or escape of pollutants;

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

(6) settling, shrinking, bulging or expansion, including resultant cracking, or pavements, patios, foundations, walls, floors, roofs or ceilings; or

(7) birds, vermin, rodents, insects or domestic animals.

If any of these cause water damage not otherwise excluded, from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

3.  excluded under General Exclusions.

Under items 1 and 2, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

## GENERAL EXCLUSIONS

1.  We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

    a.  **Ordinance or Law,** meaning enforcement of any ordinance or law regulating the use, construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

    b.  **Earth Movement,** meaning earthquake including land shock waves or tremors before, during or after a volcanic eruption; landslide; mine subsidence; mudflow; earth sinking; rising or shifting; unless direct loss by:
        (1) fire;
        (2) explosion; or
        (3) breakage of glass or safety glazing material which is part of a building, storm door or storm window;
        ensues and then we will pay only for the ensuing loss.

    c.  **Water Damage,** meaning:
        (1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;
        (2) water which backs up through sewers or drains or which overflows from a sump; or
        (3) water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.
        Direct loss by fire or explosion resulting from water damage is covered.

    d.  **Power Failure,** meaning the failure of power or other utility service if the failure takes place off the Described Location. But, if a Peril Insured Against ensues on the Described Location, we will pay only for that ensuing loss.

    e.  **Neglect,** meaning your neglect to use all reasonable means to save and preserve property at and after the time of a loss.

    f.  **War,** including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

    g.  **Nuclear Hazard,** to the extent set forth in the Nuclear Hazard Clause of the Conditions.

    h.  **Intentional Loss,** caused by you.
        This exclusion shall not apply to the interest of an innocent co-insured when any other insured intentionally causes a loss.

2.  We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

    a.  **Weather conditions.** However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the loss;

    b.  **Acts or decisions,** including the failure to act or decide, of any person, group, organization or governmental body;

    c.  **Faulty, inadequate or defective**:
        (1) planning, zoning, development, surveying, siting;
        (2) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
        (3) materials used in repair, construction, renovation or remodeling; or
        (4) maintenance;
        of part or all of any property whether on or off the Described Location.

3.  We do not insure trees, shrubs or other plants for losses of any kind.

## CONDITIONS

1. **Policy Period.** This policy applies only to loss which occurs during the policy period.

2. **Insurable Interest and Amount of Insurance.** Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:
   a. for an amount greater than the interest of a person insured under this policy; or
   b. for more than the applicable amount of insurance.

   If the Described Property is vacant and the mortgage on the property has been declared in default by the mortgagee at the time of a loss, we shall be liable for no more than the Mortgagee's interest in the property at the time of loss.

   The Mortgagee's interest is represented by the mortgagor's unpaid balance, less unearned interest and finance charges, less unearned insurance premiums, less collection and foreclosure expenses, and less late charges and penalties added to the mortgagor's unpaid balance after the inception date of this policy.

3. **Concealment or Fraud.** The entire policy will be void if, whether before or after a loss, you have:
   a. intentionally concealed or misrepresented any material fact or circumstance;
   b. engaged in fraudulent conduct; or
   c. made false statements;
   relating to this insurance.

4. **Your Duties After Loss.** In case of a loss to your covered property, you must see that the following are done:
   a. give prompt notice to us or our agent;
   b. (1) protect the property from further damage;
      (2) make reasonable and necessary repairs to protect the property; and
      (3) keep an accurate record of repair expenses;
   c. as often as we reasonably require:
      (1) show the damaged property;
      (2) provide us with records and documents we request and permit us to make copies; and
      (3) submit to examination under oath, while not in the presence of any other named insured, and sign the same;
   d. send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:
      (1) the time and cause of loss;
      (2) your interest and that of all others in the property involved and all liens on the property;
      (3) other insurance which may cover the loss;
      (4) changes in title or occupancy of the property during the term of the policy;
      (5) specifications of damaged buildings and detailed repair estimates;

5. **Loss Settlement.** Covered property losses are settled as follows:
   a. (1) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and
      (2) Structures that are not buildings;
      at actual cash value at the time of loss but not more than the amount required to repair or replace.
   b. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:
      (1) We will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:
         (a) the amount of insurance under this policy that applies to the building;
         (b) the replacement cost of that part of the building damaged for like construction and use on the same premises; or
         (c) the necessary amount actually spent to repair or replace the damaged building.
      (2) We will pay no more than the actual cash value of the damage unless:
         (a) actual repair or replacement is complete; or
         (b) the cost to repair or replace the damage is both:

       (i)  less than 5% of the amount of insurance in this policy on the building; and

       (ii)  less than $2,500.

    (3)  You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability on a replacement cost basis.

**6. Glass Replacement.** Loss for damage to glass caused by a Peril Insured Against will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

**7. Appraisal.** If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the Described Location is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:

a.  Pay its own appraiser; and

b.  bear the other expenses of the appraisal and umpire equally.

**8. Other Insurance.** This policy prohibits other insurance. In the event that the Additional Named Insured (mortgagor) has voluntary insurance with an effective date on or before the effective date of any coverage issued under this policy, this policy will be cancelled on its effective date and all premiums will be refunded. In the event that the Additional Named Insured (mortgagor) obtains insurance during the term of any coverage issued under this policy, this policy will be cancelled as of the effective date of such coverage and the premium will be refunded on a pro rata basis.

**9. Subrogation.** You may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If any assignment is sought, the person insured must sign and deliver all related papers and cooperate with us.

**10. Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.

**11. Our Option.** If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with like property.

**12. Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

a.  reach an agreement with you;

b.  there is an entry of a final judgment; or

c.  there is a filing of an appraisal award with us.

No coverage will be available to any mortgagee other than that shown as the Named Insured Mortgagee on the Declarations page of this policy.

**13. Abandonment of Property.** We need not accept any property abandoned by you.

**14. No Benefit to Bailee.** We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

**15. Cancellation.**

a.  The intent of this policy is to provide coverage for the Named Insured Mortgagee if the Additional Named Insured (mortgagor) fails to provide insurance which meets the requirements of the Named Insured Mortgagee. If the Named Insured Mortgagee no longer has an interest in the mortgaged property, this policy may be cancelled as of the effective date that the Named Insured Mortgagee no longer has an interest or at the election of the Named Insured Mortgagee this policy may remain in force until the expiration date shown on the individual certificate or policy of insurance. If the Additional Named Insured (mortgagor) provides evidence of insurance or if it is determined that the property insured by this policy is insured by "other insurance", this policy will be cancelled as of the effective date of the other insurance and all unearned premium will be refunded. If Additional Named Insured (mortgagor) provides evidence of insurance that meets the requirements of the Named Insured Mortgagee, this policy will be cancelled as of

the effective date of the policy provided by the Additional Named Insured (mortgagor) and all unearned premium will be refunded on a pro rata basis.

b. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the declarations.

Proof of mailing will be sufficient proof of notice.

(1) We may cancel this policy by mailing notice of cancellation to the Additional Named Insured at the address shown on the Additional Named Insured Endorsement or by delivering the notice not less than 30 days prior to the effective date of the cancellation.

(2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

(3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

(a) if there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy, or

(b) if the risk has changed substantially since the policy was issued.

This can be done by letting you know at least 30 days before the date cancellation takes effect.

(4) When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 30 days before the date cancellation takes effect.

c. When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

d. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

16. **Non-Renewal.** We may elect to not renew this policy. If the Named Insured Mortgagee no longer has an interest in the policy as of the expiration of the policy term, this policy will not be renewed. If the policy is not renewed, a non-renewal notice will be provided to the Additional Named Insured (mortgagor) by written notice within the number of days required by the insurance statutes of the state where the property is located. Notice will be sent to the last known address of the Additional Named Insured ( mortgagor ). Proof of mailing will be sufficient proof of notice.

17. **Liberalization Clause.** If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

This Liberalization Clause does not apply to changes implemented through introduction of a subsequent edition of our policy.

18. **Waiver or Change of Policy Provisions.** A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

19. **Assignment.** Assignment of this policy will not be valid unless we give our written consent.

20. **Death.** If you die, we insure:

a. your legal representatives but only with respect to the property of the deceased covered under the policy at the time of death;

b. with respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

21. **Nuclear Hazard Clause.**

a. "Nuclear Hazard" means any nuclear reaction, radiation or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

b. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against.

c. This policy does not apply to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

22. **Recovered Property.** If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted on the amount you received for the recovered property.

**23. Volcanic Eruption Period.** One or more volcanic eruptions that occur within a 72-hour period will be considered as one volcanic eruption.

Includes copyrighted material of Insurance Services Office, Inc, with its permission. Copyright, Insurance Services Office, Inc.

Policy Number: Q-5644337



# SIGNATURE PAGE

In witness whereof, we, as officers of the stock Company designated on the Declarations Page, have caused this policy to be executed and attested. If required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Peter T. Maloney

Secretary

David B Duclos

President

**IL1701 0413**

**Page 1 of 1**

# WASHINGTON SPECIAL PROVISIONS

**This endorsement attaches to and becomes a part of the Dwelling Hazard Coverage Form and the Dwelling Windstorm/Hail Coverage Form.**

## DEFINITIONS

The following definition is added:

In addition, certain words and phrases are defined as follows:

1. **Actual Cash Value** means:

   a. When the damage to property is economically repairable, actual cash value means the cost of repairing the damage, less reasonable deduction for wear and tear, deterioration and obsolescence.

   b. When the loss or damage to property creates a total loss, actual cash value means the market value of property in a used condition equal to that of the destroyed property, if reasonably available on the used market.

   c. Otherwise, actual cash value means the market value of new, identical or nearly identical property less reasonable deduction for wear and tear, deterioration and obsolescence.

2. **Replacement cost** means:

   a. In case of loss or damage to buildings, replacement cost means the cost, at the time of loss, to repair or replace the damaged property with new materials of like kind and quality, without deduction for depreciation.

   b. In case of loss to personal property, replacement cost means the cost, at the time of loss, of a new article identical to the one damaged, destroyed or stolen. When the identical article is no longer manufactured or is not available, replacement cost means the cost of a new article similar to the one damaged or destroyed and which is of comparable quality and usefulness, without deduction for depreciation.

## GENERAL EXCLUSIONS

General Exclusions is deleted and replaced by:

We will not pay for loss or damage caused directly or indirectly by, consisting of, or resulting from, any of the following. Such loss is excluded:

1. **Ordinance or Law**, meaning enforcement of any ordinance or law regulating the use, construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

2. **Earth Movement**, meaning earthquake including land shock waves or tremors before, during or after a volcanic eruption, landslide, mine subsidence, mudflow, earth sinking, rising or shifting, unless direct loss by:

   a. Fire;

   b. Explosion; or

   c. Breakage of glass or safety glazing material which is part of a building, storm door or storm window; ensues and then we will pay only for the ensuing loss.

3. **Water Damage**, meaning:

   a. Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

   b. Water which backs up through sewers or drains or which overflows from a sump; or

   c. Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

   Direct loss by fire or explosion resulting from water damage is covered.

4. **Power Failure**, meaning the failure of power or other utility service if the failure takes place off the Described Location. But, if a Peril Insured Against ensues on the Described Location, we will pay only for that ensuing loss.

5. **Neglect**, meaning your neglect to use all reasonable means to save and preserve property at and after the time of a loss.

6. **War**, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

7. **Nuclear Hazard**, to the extent set forth in the Nuclear Hazard Clause of the Conditions.

8. **Intentional Loss, caused by you. This exclusion shall not apply to the interest of an innocent co-insured when any other insured intentionally causes a loss.**

9. **Weather conditions**. However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in any of 1. through 8. above to produce the loss.

10. **Acts or decisions**, including the failure to act or decide, of any person, group, organization or governmental body.

11. **Faulty, inadequate or defective:**

   a. Planning, zoning, development, surveying, siting;

   b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

   c. Materials used in repair, construction, renovation or remodeling; or

   d. Maintenance;

   of part or all of any property whether on or off the Described Location.

12. We do not insure trees, shrubs or other plants for losses of any kind.

Under General Exclusions 9, 10 and 11, any ensuing loss caused by any of these, if not otherwise excluded in Coverage A and B, is covered.

**CONDITIONS**

3. **Concealment or Fraud** is deleted and replaced by the following:

3. **Concealment or Fraud.** With respect to all persons insured under this policy, we provide no coverage for loss if, whether before or after a loss, one or more persons insured under this policy have:

   a. Intentionally concealed or misrepresented any material fact or circumstance;

   b. Engaged in fraudulent conduct; or

   c. Made false statements with the intent to deceive; relating to this insurance.

12. **Loss Payment** is deleted and replaced by the following:

12. **Loss Payment**

   We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 30 days after we receive your proof of loss and:

   a. Reach an agreement with you;

   b. There is an entry of a final judgment; or

   c. There is a filing of an appraisal award with us.

15. **Cancellation** is deleted and replaced by the following:

   a. You may cancel this policy at any time by giving us verbal notice, returning it to us, or by letting us know in writing by fax, mail, or email, the date cancellation is to take effect. We will accept and promptly cancel the policy effective the later of the date notice is received, or the date you request cancellation.

   b. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice, together with our reason for cancellation, will be mailed to you and, if applicable, your agent or broker at the last addresses known to us or shown by our records. Proof of mailing will be sufficient proof of notice.

      (1) When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

      (2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 45 days before the date cancellation takes effect.

      (3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

         (a) If there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

         (b) If the risk has changed substantially since the policy was issued.

         This can be done by letting you know at least 45 days before the date cancellation takes effect.

      (4) When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 45 days before the date cancellation takes effect.

   However, with respect to Paragraphs b. (2), (3) and (4) above, if two or more of the following conditions exist at any building that is covered under this policy, we may cancel this policy by letting you and, if applicable, your agent or broker know at least 5 days before the date cancellation takes effect. We will also let any mortgagee or other person shown by the policy to have an interest in a covered loss know at least 20 days before the date cancellation takes effect.

(1) Without reasonable explanation, the building is unoccupied for more than 60 consecutive days, or at least 65% of the rental units are unoccupied for more than 120 consecutive days unless the building is maintained for seasonal occupancy or is under construction or repair;

(2) Without reasonable explanation, progress toward completion of permanent repairs to the building has not occurred within 60 days after receipt of funds following satisfactory adjustment or adjudication of loss    resulting from a fire;

(3) Because of its physical condition, the building is in danger of collapse;

(4) Because of its physical condition, a vacation or demolition order has been issued for the building, or it has been declared unsafe in accordance with applicable law;

(5) Fixed and salvageable items have been removed from the building, indicating an intent to vacate the building;

(6) Without reasonable explanation, heat, water, sewer, and electricity are not furnished for the building for 60 consecutive days; or

(7) The building is not maintained in substantial compliance with fire, safety and building codes.

c. When this policy is canceled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

d. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it as soon as possible, but no later than:

(1) 45 days after we send a notice of cancellation to you; or

(2) 30 days after we receive the policy or a notice of cancellation from you.

e. Except as noted above, if the policy is canceled by us, we will give the same advance notice of cancellation in writing to any mortgagee or other person shown by the policy to have an interest in a covered loss as we give to you. The cancellation notice may be delivered or mailed; if mailed, proof of mailing will be sufficient proof of notice.

**16. Nonrenewal** is deleted and replaced by the following:

We may elect not to renew this policy. We may do so by mailing to you and, if applicable, your agent or broker at the last addresses known to us or shown by our records, written notice, including our reason for refusing to renew, at least 45 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

If we have offered in writing, either directly or through our agent, at least 20 days before the expiration date of this policy, to renew this policy, and have included a statement of the renewal premium due, we may terminate this policy on its expiration date if you fail to pay the required premium when due.

For the purpose of determining the date when nonrenewal can be effected: A policy with a term of six months or less is considered as if written for a policy period of six months. A policy written for a term longer than one year or a policy with no fixed expiration date is considered as if written for a period of one year.

When this endorsement is attached to the Dwelling Hazard Coverage Policy Form and that policy includes the **Personal Liability Endorsement (RP1456)** the following changes apply:

**DEFINITIONS**

Definition **1.** is deleted and replaced by:

**1.** Bodily injury means bodily harm, sickness or disease, except a disease which is transmitted by an insured through sexual contact. Bodily injury includes required care, loss of services and death resulting from covered bodily harm, sickness or disease.

**EXCLUSIONS**

**Exclusion 1. g. 4)** is deleted and replaced by:

**4)** a vehicle or conveyance not subject to motor vehicle licensing which is:

(a) used to service an insured's residence;

(b) designed to assisting the handicapped; or

(c) in dead storage on an insured location;

**Exclusion 1. j.** is deleted in its entirety.

All other provisions of this policy apply.

**RESIDENTIAL PROPERTY**

# REAL ESTATE OWNED (REO) ENDORSEMENT

**The attachment of this endorsement to the policy issued under the Dwelling Hazard Coverage Form** is hereby extended to include properties owned by the named insured mortgagee as a result of foreclosure or properties held by the lender as a result of a trust agreement. "Described Property Location" indicated on the policy declaration applies to Real Estate Owned property.

Coverage applies to Residential properties (dwelling only) in which the Named Insured Mortgagee has insurable interest as mortgagee, as servicing agent by written agreement, as owner of real estate property through foreclosures, or as trustee by agreement. Individual covered properties are specified in the Additional Named Insured Certificate issued under this policy or listed on a log of REO properties provided to the company on a periodic basis.

All other terms and conditions of the policy remain unchanged.

**RP1480 0109**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

**This endorsement modifies insurance provided under the following:**

- Dwelling Hazard Coverage Form
- Commercial Hazard Coverage Form
- Dwelling Windstorm/Hail Coverage Form

## A. Cap on Certified Terrorism Losses

"Certified Acts of Terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

## B. Application of Exclusions

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War and Military Action Exclusion.

Includes copyrighted material of Insurance Services Office, Inc, with its permission. Copyright, Insurance Services Office, Inc

# EXHIBIT 9

**QBE INSURANCE CORPORATION**
88 Pine Street, 16th Floor
New York, NY 10005

**Home Office:  c/o CT Corporation System**
116 Pine Street, Suite 320
Harrisburg, PA 17101

Toll Free Customer Service: (866) 265-3321
NON-HELOC
100 N TRYON ST
CHARLOTTE, NC 28255-0001

## Additional Named Insured Certificate

LOAN NUMBER: 9046-0000-    0780

**ADDITIONAL NAMED INSURED**
SUE HONG
22515 10TH AVE S
DES MOINES, WA 98198-6914

NOTIFICATION DATE: 10/27/2015

**NAMED INSURED MORTGAGEE**
BANK OF AMERICA, N.A.
NON-HELOC
100 N TRYON ST
CHARLOTTE, NC 28255-0001

| | | Amount of Insurance | Premium |
|---|---|---|---|
| POLICY NUMBER Q-5757404 | Dwelling | $519,700.00 | $4,677.30 |
| POLICY TERM: | Personal Property Endorsement | $0.00 | $0.00 |
| FROM 10/21/2015    TO 10/21/2016 | Additional Living Expense Endorsement | $0.00 | $0.00 |
| ☐ NOON    ☒ 12:01am | Other Endorsements | | $0.00 |
| Standard Time at your Residence Address | Deductible - per loss occurrence | | |
| | Property is VACANT at time of loss | $1,000.00 | |
| | Vandalism & Malicious Mischief | $1,000.00 | |
| | All Other Covered Losses | $1,000.00 | |

| | | Limit of Liability | Premium |
|---|---|---|---|
| PROPERTY LOCATION<br>22515 10TH AVENUE SOUTH<br>DES MOINES WA 98198 | Personal Liability Endorsement | $0.00 | $0.00 |
| | Medical Payments | $0.00 | $0.00 |
| | WA REGULATORY SURCHARGE | 0.125% | $5.85 |
| ENDORSEMENTS ATTACHED AND FORMING A PART OF THE POLICY<br>PRV-5 (01-13), RP1200 (0109), RP1211 (0109), IL1701 (0413), RP1546 (0114), RP1480 (0109), IL1705 (0109), IL1401 (0109) | TOTAL CHARGES | | $4,683.15 |

### NOTICE TO ADDITIONAL NAMED INSURED (BORROWER):

**THIS INSURANCE WILL NOT PROVIDE COVERAGE FOR AN AMOUNT GREATER THAN THE AMOUNT OF INSURANCE SHOWN ABOVE. THIS POLICY MAY NOT FULLY PROTECT YOUR INTEREST IN THE PROPERTY LISTED. THIS POLICY DOES NOT PROVIDE PERSONAL PROPERTY COVERAGE OR LIABILITY COVERAGE, UNLESS INDICATED ABOVE. PLEASE REFER TO THE ATTACHED FORM(S) FOR A FULL DESCRIPTION OF THE TERMS AND LIMITATIONS OF THIS COVERAGE.**

For Customer Service questions, please call our toll free Customer Service Number at: (866) 265-3321

To report a claim, please contact our Claim Department at 1-800-323-7466
or, you may report a new claim using our website at www.qbefirst.com

RP1156 0209

Page 1 of 2

**Personal Property and Personal Liability Coverages** - We will cover your personal property, additional living expense or Personal Liability under this policy ONLY if an "Amount of Insurance" or "Limit of Liability" and a premium are shown above. Coverage will be provided according to the terms and conditions of the endorsements attached to this policy. If no "Amount of Insurance" or "Limit of Liability" is shown and no premium is shown no coverage will be provided for Personal Property, Additional Living Expense or Personal Liability. These endorsements are available only for a residence that is owner occupied. **These coverages are void if the residence is vacant or occupied by someone other than the Additional Named Insured shown above at the time of loss.**

**DEDUCTIBLES:** Please refer to the deductibles shown above for the coverage provided by this policy.

Subject to the terms and provisions of this policy and the coverage forms and endorsements attached hereto, it is agreed that the insurance applies to the property described above and to any person shown as an Additional Named Insured with respect to such property, subject to the following additional provisions:

(a) The above Named Insured Mortgagee is authorized to advance all funds to be recovered from the Additional Named Insured(s) for the insurance afforded.

(b) Loss, if any, shall be adjusted with and payable to the above Named Insured Mortgagee and the Additional Named Insured(s) as their interest may appear, either by a single instrument so worded or by separate instruments payable respectively to the Named Insured Mortgagee and the Additional Named Insured(s), at the company's option.

**For Customer Service questions, please call our toll free Customer Service Number at: (866) 265-3321
To report a CLAIM, please contact our Claim Department at: 1-800-323-7466**

# Dwelling Hazard Coverage Form

## Table of Contents

|  | Page # |
|---|---|
| AGREEMENT ............................................................ | 1 |
| DEFINITIONS ......................................................... | 1 |
| COVERAGES  ......................................................... | 1 |
| OTHER COVERAGES  ............................................. | 2-4 |
| PERILS INSURED AGAINST  .................................. | 4-6 |
| GENERAL EXCLUSIONS  ...................................... | 6-7 |
| CONDITIONS ........................................................ | 9-10 |

# DWELLING HAZARD COVERAGE FORM

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

In this policy, "you" and "your" refer to the "Named Insured Mortgagee" and the "Additional Named Insured" shown in the Declarations. "We", "us" and "our" refer to the Company providing this insurance.

## COVERAGES

This insurance applies to the Described Location, Coverages for which an Amount of Insurance is shown and Perils Insured Against for which a Premium is stated.

### COVERAGE A - Dwelling

We cover:

1. the dwelling on the Described Location shown in the Declarations, used principally for dwelling purposes not to exceed four (4) living units, including, but not limited to, individually owned townhouses or permanently situated mobile homes;

2. structures attached to the dwelling;

3. materials and supplies located on or next to the Described Location used to construct, alter or repair the dwelling or other structures on the Described Location; and

4. if not otherwise covered in this policy, building equipment, and outdoor equipment used for the service of and located on the Described Location.

This coverage does not apply to land, including land on which the dwelling is located.

### COVERAGE B - Other Structures

We cover other structures on the Described Location, set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

This coverage does not apply to land, including land on which the other structures are located.

We do not cover other structures:

1. used in whole or in part for commercial, manufacturing or farming purposes; or

2. rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

## OTHER COVERAGES

1. **Other Structures.** You may use up to 10% of the Coverage A amount of insurance for loss by a Peril Insured Against to other structures described in Coverage B.

   Use of this coverage does not reduce the Coverage A amount of insurance for the same loss.

2. **Debris Removal.** We will pay your reasonable expense for the removal of:

   a. debris of covered property if a Peril Insured Against causes the loss; or

   b. ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

   Debris removal expense is included in the amount of insurance applying to Coverage A.

3. **Reasonable Repairs.** In the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage. If the measures taken involve repair to other damaged property, we will pay for those measures only if that property is covered under this policy and the damage to that property is caused by an applicable Peril Insured Against.

... ...vage;

a  ...es not increase the amount of insurance that applies to the covered property;

b.  does not relieve you of your duties, in case of a loss to covered property, as set forth in Condition 4.b.

Reasonable Repairs is included in the amount of insurance applying to Coverage A.

4.  Collapse.  We insure for risk of direct damage physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

(1)  hidden decay;

(2)  hidden insect or vermin damage;

(3)  weight of contents, equipment, animals or people;

(4)  weight of rain which collects on a roof;

(5)  use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items (1),(2),(3),(4) or (5) unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking or shrinking.

This coverage does not increase the amount of insurance applying to the damaged covered property.

## PERILS INSURED AGAINST

## COVERAGE A - DWELLING

## COVERAGE B - OTHER STRUCTURES

We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property; however, we do not insure loss:

1.  involving collapse, other than as provided in Other Coverages 4.;

2.  caused by:

a  freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing.  This exclusion applies only while the dwelling is being constructed;

b.  freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

(1)  fence, pavement, patio or swimming pool;

(2)  foundation, retaining wall or bulkhead; or

(3)  pier, wharf or dock;

c.  theft of property not part of a covered building or structure;

d.  theft in or to a dwelling or structure under construction;

e.  wind, hail, ice, snow or sleet to outdoor radio or television antennas and aerials including lead-in wiring, masts or towers;

f.  constant or repeated seepage or leakage of water or steam over a period of weeks, months or years from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance;

g.  (1)  wear and tear, marring, deterioration;

(2)  inherent vice, latent defect, mechanical breakdown;

(3)  smog, rust or other corrosion, mold, wet or dry rot;

(4)  smoke from agricultural smudging or industrial operations;

(5)  discharge, dispersal, seepage, migration, release or escape of pollutants;

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed;

(6)  settling, shrinking, bulging or expansion, including resultant cracking, or pavements, patios, foundations, walls, floors, roofs or ceilings; or

(7)  birds, vermin, rodents, insects or domestic animals.

If any of these cause water damage not otherwise excluded, from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance.  We do not cover loss to the system or appliance from which this water escaped.

Includes copyrighted material of Insurance Services Office, Inc, with its permission.  Copyright, Insurance Services Office, Inc.

3. Loss Under General Exclusions.

Under items 1 and 2, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

## GENERAL EXCLUSIONS

1. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

   a. Ordinance or Law, meaning enforcement of any ordinance or law regulating the use, construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

   b. Earth Movement, meaning earthquake including land shock waves or tremors before, during or after a volcanic eruption; landslide; mine subsidence; mudflow; earth sinking; rising or shifting; unless direct loss by:

      (1) fire;

      (2) explosion; or

      (3) breakage of glass or safety glazing material which is part of a building, storm door or storm window;

      ensues and then we will pay only for the ensuing loss.

   c. Water Damage, meaning:

      (1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

      (2) water which backs up through sewers or drains or which overflows from a sump; or

      (3) water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

      Direct loss by fire or explosion resulting from water damage is covered.

   d. Power Failure, meaning the failure of power or other utility service if the failure takes place off the Described Location. But, if a Peril Insured Against ensues on the Described Location, we will pay only for that ensuing loss.

   e. Neglect, meaning your neglect to use all reasonable means to save and preserve property at and after the time of a loss.

   f. War, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

   g. Nuclear Hazard, to the extent set forth in the Nuclear Hazard Clause of the Conditions.

   h. Intentional Loss, caused by you.

      This exclusion shall not apply to the interest of an innocent co-insured when any other insured intentionally causes a loss.

2. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

   a. Weather conditions. However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the loss;

   b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body;

   c. Faulty, inadequate or defective:

      (1) planning, zoning, development, surveying, siting;

      (2) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

      (3) materials used in repair, construction, renovation or remodeling; or

      (4) maintenance;

      of part or all of any property whether on or off the Described Location.

3. We do not insure trees, shrubs or other plants for losses of any kind.

| CONDITIONS |
|---|

1. **Policy Period.** This policy applies only to loss which occurs during the policy period.

2. **Insurable Interest and Amount of Insurance.** Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

   a. for an amount greater than the interest of a person insured under this policy; or

   b. for more than the applicable amount of insurance.

   If the Described Property is vacant and the mortgage on the property has been declared in default by the mortgagee at the time of a loss, we shall be liable for no more than the Mortgagee's interest in the property at the time of loss.

   The Mortgagee's interest is represented by the mortgagor's unpaid balance, less unearned interest and finance charges, less unearned insurance premiums, less collection and foreclosure expenses, and less late charges and penalties added to the mortgagor's unpaid balance after the inception date of this policy.

3. **Concealment or Fraud.** The entire policy will be void if, whether before or after a loss, you have:

   a. intentionally concealed or misrepresented any material fact or circumstance;

   b. engaged in fraudulent conduct; or

   c. made false statements;

   relating to this insurance.

4. **Your Duties After Loss.** In case of a loss to your covered property, you must see that the following are done:

   a. give prompt notice to us or our agent;

   b. (1) protect the property from further damage;

      (2) make reasonable and necessary repairs to protect the property; and

      (3) keep an accurate record of repair expenses;

   c. as often as we reasonably require:

      (1) show the damaged property;

      (2) provide us with records and documents we request and permit us to make copies; and

      (3) submit to examination under oath, while not in the presence of any other named insured, and sign the same;

   d. send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

      (1) the time and cause of loss;

      (2) your interest and that of all others in the property involved and all liens on the property;

      (3) other insurance which may cover the loss;

      (4) changes in title or occupancy of the property during the term of the policy;

      (5) specifications of damaged buildings and detailed repair estimates;

5. **Loss Settlement.** Covered property losses are settled as follows:

   a. (1) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and

      (2) Structures that are not buildings;

      at actual cash value at the time of loss but not more than the amount required to repair or replace.

   b. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

      (1) We will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

         (a) the amount of insurance under this policy that applies to the building;

         (b) the replacement cost of that part of the building damaged for like construction and use on the same premises; or

         (c) the necessary amount actually spent to repair or replace the damaged building.

      (2) We will pay no more than the actual cash value of the damage unless:

         (a) actual repair or replacement is complete; or

         (b) the cost to repair or replace the damage is both:

(i) less than 5% of the amount of insurance in this policy on the building; and

(ii) less than $2,500.

(b) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability on a replacement cost basis.

6. **Glass Replacement.** Loss for damage to glass caused by a Peril Insured Against will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

7. **Appraisal.** If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the Described Location is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:
a. Pay its own appraiser; and
b. Bear the other expenses of the appraisal and umpire equally.

8. **Other Insurance.** This policy prohibits other insurance. In the event that the Additional Named Insured (mortgagor) has voluntary insurance with an effective date on or before the effective date of any coverage issued under this policy, this policy will be cancelled on its effective date and all premiums will be refunded. In the event that the Additional Named Insured (mortgagor) obtains insurance during the term of any coverage issued under this policy, this policy will be cancelled as of the effective date of such coverage and the premium will be refunded on a pro rata basis.

9. **Subrogation.** You may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If any assignment is sought, the person insured must sign and deliver all related papers and cooperate with us.

10. **Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.

11. **Our Option.** If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with like property.

12. **Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:
a. reach an agreement with you;
b. there is an entry of a final judgment; or
c. there is a filing of an appraisal award with us.

No coverage will be available to any mortgagee other than that shown as the Named Insured Mortgagee on the Declarations page of this policy.

13. **Abandonment of Property.** We need not accept any property abandoned by you.

14. **No Benefit to Bailee.** We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

15. **Cancellation.**
a. The intent of this policy is to provide coverage for the Named Insured Mortgagee if the Additional Named Insured (mortgagor) fails to provide insurance which meets the requirements of the Named Insured Mortgagee. If the Named Insured Mortgagee no longer has an interest in the mortgaged property, this policy may be cancelled as of the effective date that the Named Insured Mortgagee no longer has an interest or at the election of the Named Insured Mortgagee this policy may remain in force until the expiration date shown on the individual certificate or policy of insurance. If the Additional Named Insured (mortgagor) provides evidence of insurance or if it is determined that the property insured by this policy is insured by "other insurance", this policy will be cancelled as of the effective date of the other insurance and all unearned premium will be refunded. If Additional Named Insured (mortgagor) provides evidence of insurance that meets the requirements of the Named Insured Mortgagee, this policy will be cancelled as of

  tive date of the policy provided by the Additional Named Insured (mortgagor) and all unearned premium will be refunded on a pro rata basis.

b.   We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect.  This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the declarations.

Proof of mailing will be sufficient proof of notice.

   (1)  We may cancel this policy by mailing notice of cancellation to the Additional Named Insured at the address shown on the Additional Named Insured Endorsement or by delivering the notice not less than 30 days prior to the effective date of the cancellation.

   (2)  When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

   (3)  When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

      (a)  if there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy, or

      (b)  if the risk has changed substantially since the policy was issued.

   This can be done by letting you know at least 30 days before the date cancellation takes effect.

   (4)  When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 30 days before the date cancellation takes effect.

c.   When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

d.   If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

**16. Non-Renewal.**  We may elect to not renew this policy.  If the Named Insured Mortgagee no longer has an interest in the policy as of the expiration of the policy term, this policy will not be renewed.  If the policy is not renewed, a non-renewal notice will be provided to the Additional Named Insured (mortgagor) by written notice within the number of days required by the insurance statutes of the state where the property is located.  Notice will be sent to the last known address of the Additional Named Insured ( mortgagor ).  Proof of mailing will be sufficient proof of notice.

**17. Liberalization Clause.**  If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

This Liberalization Clause does not apply to changes implemented through introduction of a subsequent edition of our policy.

**18. Waiver or Change of Policy Provisions**.  A waiver or change of a provision of this policy must be in writing by us to be valid.  Our request for an appraisal or an examination will not waive any of our rights.

**19. Assignment.**  Assignment of this policy will not be valid unless we give our written consent.

**20. Death.** If you die, we insure:
a.   your legal representatives but only with respect to the property of the deceased covered under the policy at the time of death;

b.   with respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

**21. Nuclear Hazard Clause.**
a.   "Nuclear Hazard" means any nuclear reaction, radiation or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

b.   Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against.

c.   This policy does not apply to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

**22. Recovered Property.** If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery.  At your option, the property will be returned to or retained by you or it will become our property.  If the recovered property is returned to or retained by you, the loss payment will be adjusted on the amount you received for the recovered property.

23. _____ _____ period. One or more volcanic eruptions that occur within a 72-hour period will be _____ _____ volcanic eruption.

Includes copyrighted material of Insurance Services Office, Inc, with its permission.  Copyright, Insurance Services Office, Inc.



# SIGNATURE PAGE

In witness whereof, we, as officers of the stock Company designated on the Declarations Page, have caused this policy to be executed and attested. If required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Jeffrey Weissmann

Secretary

Barry S. Karfunkel

President

**Residential Property**

# WASHINGTON SPECIAL PROVISIONS

**This endorsement attaches to and becomes a part of the Dwelling Hazard Coverage Form and the Dwelling Windstorm/Hail Coverage Form.**

## DEFINITIONS

The following definition is added:

In addition, certain words and phrases are defined as follows:

1. **Actual Cash Value** means:

   a. When the damage to property is economically repairable, actual cash value means the cost of repairing the damage, less reasonable deduction for wear and tear, deterioration and obsolescence.

   b. When the loss or damage to property creates a total loss, actual cash value means the market value of property in a used condition equal to that of the destroyed property, if reasonably available on the used market.

   c. Otherwise, actual cash value means the market value of new, identical or nearly identical property less reasonable deduction for wear and tear, deterioration and obsolescence.

2. **Replacement cost** means:

   a. In case of loss or damage to buildings, replacement cost means the cost, at the time of loss, to repair or replace the damaged property with new materials of like kind and quality, without deduction for depreciation.

   b. In case of loss to personal property, replacement cost means the cost, at the time of loss, of a new article identical to the one damaged, destroyed or stolen. When the identical article is no longer manufactured or is not available, replacement cost means the cost of a new article similar to the one damaged or destroyed and which is of comparable quality and usefulness, without deduction for depreciation.

## GENERAL EXCLUSIONS

General Exclusions is deleted and replaced by:

We will not pay for loss or damage caused directly or indirectly by, consisting of, or resulting from, any of the following. Such loss is excluded:

1. **Ordinance or Law**, meaning enforcement of any ordinance or law regulating the use, construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

2. **Earth Movement**, meaning earthquake including land shock waves or tremors before, during or after a volcanic eruption, landslide, mine subsidence, mudflow, earth sinking, rising or shifting, unless direct loss by:

   a. Fire;

   b. Explosion; or

   c. Breakage of glass or safety glazing material which is part of a building, storm door or storm window; ensues and then we will pay only for the ensuing loss.

3. **Water Damage**, meaning:

   a. Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

   b. Water which backs up through sewers or drains or which overflows from a sump; or

   c. Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

   Direct loss by fire or explosion resulting from water damage is covered.

4. **Power Failure**, meaning the failure of power or other utility service if the failure takes place off the Described Location. But, if a Peril Insured Against ensues on the Described Location, we will pay only for that ensuing loss.

5. **Neglect**, meaning your neglect to use all reasonable means to save and preserve property at and after the time of a loss.

6. **War**, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

7. **Nuclear Hazard**, to the extent set forth in the Nuclear Hazard Clause of the Conditions.

8. **Intentional Loss, caused by you. This exclusion shall not apply to the interest of an innocent co-insured when any other insured intentionally causes a loss.**

9. Wea... ... ... ... However, this exclusion only applies if weather conditions contribute in any way with a cause or even... ... ... any of 1. through 8. above to produce the loss.

10. Acts or ... ... including the failure to act or decide, of any person, group, organization or governmental body.

11. Faulty, inadequate or defective:

   a. Planning, zoning, development, surveying, siting;

   b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

   c. Materials used in repair, construction, renovation or remodeling; or

   d. Maintenance,

   of part or all of any property whether on or off the Described Location.

12. We do not insure trees, shrubs or other plants for losses of any kind.

Under General Exclusions 9, 10 and 11, any ensuing loss caused by any of these, if not otherwise excluded in Coverage A and B, is covered.

## CONDITIONS

3. Concealment or Fraud is deleted and replaced by the following:

3. Concealment or Fraud. With respect to all persons insured under this policy, we provide no coverage for loss if, whether before or after a loss, one or more persons insured under this policy have:

   a. Intentionally concealed or misrepresented any material fact or circumstance;

   b. Engaged in fraudulent conduct; or

   c. Made false statements with the intent to deceive; relating to this insurance.

12. Loss Payment is deleted and replaced by the following:

12. Loss Payment

   We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 30 days after we receive your proof of loss and:

   a. Reach an agreement with you;

   b. There is an entry of a final judgment; or

   c. There is a filing of an appraisal award with us.

15. Cancellation is deleted and replaced by the following:

   a. You may cancel this policy at any time by giving us or the insurance agent through which this policy was issued verbal notice, returning it to us or the insurance agent through which this policy was issued, or by letting us or the insurance agent through which this policy was issued know in writing by fax, mail, or email, the date cancellation is to take effect. We will accept and promptly cancel the policy effective the later of the date notice is received, or the date you request cancellation.

   b. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice, together with our reason for cancellation, will be mailed to you and if applicable, your agent or broker at the last addresses known to us or shown by our records. Proof of mailing will be sufficient proof of notice.

      (1) When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

      (2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 45 days before the date cancellation takes effect.

      (3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

         (a) if there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

         (b) if the risk has changed substantially since the policy was issued.

         This can be done by letting you know at least 45 days before the date cancellation takes effect.

      (4) When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 45 days before the date cancellation takes effect.

   However, with respect to Paragraphs b. (2), (3) and (4) above, if two or more of the following conditions exist at any building that is covered under this policy, we may cancel this policy by letting you and, if applicable, your

agent or at least 5 days before the date cancellation takes effect. We will also let any mortgagee or other person shown by the policy to have an interest in a covered loss know at least 20 days before the date cancellation takes effect.

    (1)  Without reasonable explanation, the building is unoccupied for more than 60 consecutive days, or at least 65% of the rental units are unoccupied for more than 120 consecutive days unless the building is maintained for seasonal occupancy or is under construction or repair;

    (2)  Without reasonable explanation, progress toward completion of permanent repairs to the building has not been made within 60 days after receipt of funds following satisfactory adjustment or adjudication of loss resulting from a fire;

    (3)  Because of its physical condition, the building is in danger of collapse;

    (4)  Because of its physical condition, a vacation or demolition order has been issued for the building, or it has been declared unsafe in accordance with applicable law;

    (5)  Fixed and salvageable items have been removed from the building, indicating an intent to vacate the building;

    (6)  Without reasonable explanation, heat, water, sewer, and electricity are not furnished for the building for 60 consecutive days; or

    (7)  The building is not maintained in substantial compliance with fire, safety and building codes.

  **c.**  When this policy is canceled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

  **d.**  If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it as soon as possible, but no later than:

    (1)  45 days after we send a notice of cancellation to you; or

    (2)  30 days after we receive the policy or a notice of cancellation from you.

  **e.**  Except as noted above, if the policy is canceled by us, we will give the same advance notice of cancellation in writing to any mortgagee or other person shown by the policy to have an interest in a covered loss as we give to you. The cancellation notice may be delivered or mailed; if mailed, proof of mailing will be sufficient proof of notice.

**16.** **Nonrenewal** is deleted and replaced by the following:

We may elect not to renew this policy. We may do so by mailing to you and, if applicable, your agent or broker at the last addresses known to us or shown by our records, written notice, including our reason for refusing to renew, at least 45 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

If we have offered in writing, either directly or through our agent, at least 20 days before the expiration date of this policy, to renew this policy, and have included a statement of the renewal premium due, we may terminate this policy on its expiration date if you fail to pay the required premium when due.

For the purpose of determining the date when nonrenewal can be effected: A policy with a term of six months or less is considered as if written for a policy period of six months. A policy written for a term longer than one year or a policy with no fixed expiration date is considered as if written for a period of one year.

When this endorsement is attached to the Dwelling Hazard Coverage Policy Form and that policy includes the **Personal Liability Endorsement** the following changes apply:

**DEFINITIONS**

Definition 1. is deleted and replaced by:

    1.  Bodily injury means bodily harm, sickness or disease, except a disease which is transmitted by an insured through sexual contact. Bodily injury includes required care, loss of services and death resulting from covered bodily harm, sickness or disease.

**EXCLUSIONS**

Exclusion 1. g. 4) is deleted and replaced by:

    4)  a vehicle or conveyance not subject to motor vehicle licensing which is:

      (a)  used to service an insured's residence;

      (b)  designed to assisting the handicapped; or

      (c)  in dead storage on an insured location;

Exclusion 1. k. is deleted in its entirety.

All other provisions of this policy apply.

**RESIDENTIAL PROPERTY**

## REAL ESTATE OWNED (REO) ENDORSEMENT

The attachment of this endorsement to the policy issued under the Dwelling Hazard Coverage Form is hereby extended to include properties owned by the named insured mortgagee as a result of foreclosure or properties held by the lender as a result of a trust agreement. "Described Property Location" indicated on the policy declaration applies to Real Estate Owned property.

Coverage applies to Residential properties (dwelling only) in which the Named Insured Mortgagee has insurable interest as mortgagee, as servicing agent by written agreement, as owner of real estate property through foreclosures, or as trustee by agreement. Individual covered properties are specified in the Additional Named Insured Certificate issued under this policy or listed on a log of REO properties provided to the company on a periodic basis.

All other terms and conditions of the policy remain unchanged.

00A11-00ED0008-E1015                                                                      **Page 1 of 1**

# INTEGON NATIONAL INSURANCE COMPANY
## Privacy Notice

*The National General Insurance Group\* is giving you this notice to tell you how we may collect and share nonpublic personal information about you and the accounts you have with a company (or companies) in the National General Insurance Group. This notice also advises you of your right to keep this information from being shared with affiliates of the National General Insurance Group\*\* or other business associates (non-affiliates) under certain circumstances and your right to limit marketing, in some cases.*

### What Nonpublic Personal Information Do We Collect About You?

We collect nonpublic personal information about you and the members of your household from the following sources:

- information we receive from you, such as information on applications or other forms, which may include your name, address, e-mail address, social security number and driving history.

- Information about your transactions with us, our affiliates, or others, such as your account balance and payment history.

- information we receive from outside sources such as consumer reporting agencies, insurance agencies and state motor vehicle departments which may provide information on your credit history, credit score, driving and accident history, or prior insurance coverage in place. Please note that the information obtained from outside sources may be retained by those outside sources and disclosed to other persons without our knowledge.

- information about your computer hardware and software that may be collected by us if you contact our Website electronically. This information can include: your IP address, browser type, domain names, access times, and referring Website addresses. This information is used for the operation of the Website, to maintain quality of the Website, and to provide general statistics regarding use of our Website.

- If you obtain a life, long-term care or disability product, information we receive from you, medical professionals who have provided care to you and insurance support organizations regarding your health.

### How Do We Protect The Information That We Collect About You and Your Accounts?

To protect the privacy and security of nonpublic personal information we collect about you, we restrict access to the information to our employees, agents and subcontractors who need this information to provide products and services to you. We maintain physical, electronic, and procedural safeguards that comply with applicable federal and state laws and regulations to guard your nonpublic personal information. We strive to keep our information about you accurate. We require those individuals to whom we permit access to your customer information to protect it and keep it confidential. You may review the information we have collected and your account and if you tell us of an error, we will update our records promptly. If you wish to review or correct personal information on your account, please write to us at the address on your account statement or other account materials.

### Do We Share The Information We Collect About You and Your Accounts?

Yes, to provide you with superior service, inform you of product and service opportunities that may be of interest to you, or for other business purposes, **we may share** all of the nonpublic personal information we collect about you and your accounts, as described above, as permitted by law. Our sharing of information about you is subject to Your Rights, described below.

However, we do not sell, rent or lease our customer lists to third parties.

We will disclose your personal information, without notice, only if required to do so by law or in the good faith belief that such action is necessary to: (a) conform to the edicts of the law or comply with legal process served on us; (b) protect and defend our rights or property; (c) act under exigent circumstances to protect the personal safety of our customers, or the public; and (d) to process insurance claims.

**For Vermont Residents Only:** Based on Vermont law, we do not share nonpublic personal information about you with affiliates or non-affiliated third parties, other than as permitted by law. We automatically treat your accounts as if you made the Information Sharing and Affiliate Marketing opt out elections described below.

### What Types of Affiliates and Non-affiliated Third Parties Do We Share Information About You With?

Subject to Your Rights, detailed below, **we may share** nonpublic personal information about you with the following types of affiliates and non-affiliated third parties:

- Financial service providers, such as, credit card issuers, insurance companies, and insurance agents.

financial companies, such as credit reporting agencies, manufacturers, motor vehicle dealers, direct marketers, telecommunications companies, airlines, management companies, attorneys and publishers.

- Companies that perform marketing services on our behalf or with other institutions with which we have joint marketing agreements.
- Others, such as educational institutions.
- We may also share nonpublic personal information about you with affiliates and non-affiliated third parties, as permitted by law, including consumer report information, such as information from credit reports and certain application information, that we have received from you and from third parties, such as consumer reporting agencies and insurance support organizations.

## Do We Share Information About Former Customers?

Yes, subject to Your Rights - detailed below, **we may share** all of the nonpublic personal information described above about our former customers with the same types of affiliates and non-affiliated third parties, as described above as permitted by law.

## Modifications to our Privacy Policy

We reserve the right to change our privacy practices in the future, which may include sharing nonpublic personal information about you with non-affiliated third parties. Before we do that, we will provide you with a revised privacy notice and give you the opportunity to opt out of that type of information sharing.

## Your Rights:
### Information Sharing

- If you want a company in the National General Insurance Group not to share nonpublic personal information about you with affiliates, non-affiliated third parties, or both, **you may opt out of Information Sharing.** That is, you may direct the company in the National General Insurance Group not to share information (other than as permitted by law). Information Sharing permitted by law includes, for example, sharing with companies that work for a company in the National General Insurance Group to provide the product or services you request and sharing with affiliates information about our transactions or experiences with you for everyday business purposes.
- Your Information Sharing opt out direction will apply to nonpublic personal information, as described above, that the company in the National General Insurance Group has collected about you and your existing accounts.

## Affiliate Marketing

- Federal law gives you the right to limit some but not all marketing from the companies in the National General Insurance Group and their affiliates. You may limit companies in the National General Insurance Group and their affiliates from marketing their products or services to you **based on nonpublic personal information about you that they receive from a company in the National General Insurance Group.** This information includes income, account information, credit history, and payment history.
- Your choice to limit Affiliate Marketing will apply to nonpublic information about you and your existing account.

## How to Opt Out of Information Sharing or Limit Affiliate Marketing:

- If you wish to opt out of Information Sharing with affiliates, or with non-affiliated third parties, or with both, or to limit Affiliate Marketing, other than as permitted by law, please complete the form below and return it to the following address:

      INTEGON NATIONAL INSURANCE COMPANY
      P.O. BOX 961291
      FORT WORTH, TX 76161

- Each time you establish a new account with a company in the National General Insurance Group, you will receive a privacy notice and an opportunity to opt out of Information Sharing and limit Affiliate Marketing for that account, as permitted by law.
- If you have a joint account with another person, either of you may opt out of Information Sharing or limit Affiliate Marketing (other than as permitted by law) for both of you.

*Reference to the National General Insurance Group in this notice includes the following companies: National General Insurance Company, National General Insurance Company, National General Insurance Online, Inc., Integon Casualty Insurance Company, Integon General Insurance Corporation, Integon Indemnity Corporation, Integon National Insurance Company, Integon Preferred Insurance Company, New South Insurance Company, MIC General Insurance Corporation, Home State County Mutual Insurance Company - (Administered by Integon National Insurance Company), National General Insurance Company, Imperial Fire & Casualty Insurance Company or Integon Indemnity Corporation), National General Motor Club, Inc., National Health Insurance Company, Agent Alliance Insurance Company, National General Premier Insurance Company, Imperial Fire & Casualty Insurance Company, Adirondack Insurance Exchange, Mountain Valley Indemnity Company, New Jersey Skylands Insurance Association, New Jersey Skylands Insurance Company, Century-National Insurance Company, Standard Property and Casualty Insurance Company, Direct Insurance Company, Direct General Insurance Company, Direct General Insurance Company of Louisiana, Direct General Insurance Company of Mississippi, Direct National Insurance Company, Direct General Life Insurance Company, and Old American County Mutual Fire Insurance Company (Administered by Direct General Insurance Agency).

**Affiliates of the National General Insurance Group include: companies in the National General Insurance Group referenced in this notice, and companies that now or in the future control, are controlled by, or are under common control with a company in the National General Insurance Group.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

I direct my information not be shared with affiliates or with non-affiliated third parties, and to limit Affiliate Marketing, other than as permitted by law.

| | |
|---|---|
| Sue Hong | Q-5940962 |
| Homeowner | Policy Number |
| 22515 10TH AVENUE SOUTH DES MOINES WA 98198 | 9046-      0780 |
| Property Address | Loan Number |
| Signature | Date |

**INTEGON NATIONAL INSURANCE COMPANY**
5630 University Parkway
Winston Salem, NC 27105

**Toll Free Customer Service: (866) 265-3321**

NOTIFICATION DATE: 06/13/2018

ADDITIONAL NAMED INSURED
SUE HONG
22515 10TH AVE S
DES MOINES, WA  98198

<table>
<tr><td colspan="2" align="center">**LENDER-PLACED HAZARD INSURANCE<br>CANCELLATION NOTICE**</td></tr>
<tr><td>LOAN NUMBER:        0780</td><td>**NAMED INSURED MORTGAGEE**<br>BANK OF AMERICA, N.A.<br>P.O. BOX 961291<br>FORT WORTH, TX 76161</td></tr>
<tr><td colspan="2">The insurance coverage BANK OF AMERICA, N.A. obtained for the Property Location referenced below has been cancelled.</td></tr>
<tr><td align="right">PROPERTY LOCATION:</td><td>22515 10TH AVENUE SOUTH<br>DES MOINES WA  98198</td></tr>
<tr><td align="right">POLICY NUMBER:</td><td>Q5940962</td></tr>
<tr><td align="right">POLICY EFFECTIVE TERM:</td><td>From 02/27/2018 to 06/11/2018</td></tr>
<tr><td align="right">CANCEL REASON:</td><td>SERVICER REQUEST</td></tr>
<tr><td align="right">CANCELLATION EFFECTIVE DATE:</td><td>06/11/2018 at 12:01 AM Standard Time</td></tr>
<tr><td align="right">TOTAL INSURANCE/PREMIUM CHARGES:</td><td>$3,317.23</td></tr>
<tr><td align="right">TOTAL RETURN PREMIUM AMOUNT:</td><td>$2,372.05</td></tr>
</table>

This coverage has been cancelled as of 06/11/2018. Any unearned premium is shown above as Total Return Premium Amount. The return premium will be provided to Bank of America and credited to your account as determined by Bank of America.

**If you had other coverage during the Policy Effective Term shown above, please provide Bank of America with a copy of your policy.**

PLEASE NOTE: If you have any questions or need additional information, please call Bank of America Customer Service Department at (866) 265-3321, Monday through Friday, 8 a.m. to 9 p.m. Eastern.  Your call may be monitored and recorded for quality assurance.

Para ayuda en Español, llame por favor a (866) 265-3321 y solicite un representante que hable Español.
For assistance in Spanish, please call (866) 265-3321 and request a Spanish-speaking representative.

9046

Bank of America

P.O. BOX 982281
EL PASO, TX 79998

Notice Date: JUNE 26, 2018

22515 10TH AVE S
DES MOINES, WA 98198

## Thank you for being a valued customer. We appreciate your relationship with us. We need your help in obtaining proof of your current insurance coverage within 60 days from the date of this notice.

We want to let you know that as of the date of this notice, we haven't received current insurance information on your property, which is typically provided to us by your insurance agent or carrier. Unfortunately, because we don't have current insurance information, we're required to send you the enclosed notice.

### What you need to know

- Please keep in mind, this notice provides certain information and disclosures required by federal law, but doesn't necessarily address your specific situation or circumstances.
- Please read the notice carefully and follow the steps outlined.

### We're here to help

We appreciate you working with us so we have the most current information to ensure your property is adequately insured and to help avoid lender-placed insurance.

If you have any questions, please call us at (866) 265-3321, Monday through Friday, 8 a.m. to 9 p.m. Eastern.

9046

**BankofAmerica**

Home Loans
PO BOX 601291
FORT WORTH, TX  76161

Notice Date: JUNE 26, 2018

001103 - 027700
Sue Hong
22515 10TH AVE S
DES MOINES, WA  98198

Subject:  Please provide insurance information for
22515 10TH AVENUE SOUTH
DES MOINES WA  98198

Dear Sue Hong:

Our records show that your homeowners (hazard) insurance expired, and we do not have evidence that you have obtained new coverage. **Because homeowners (hazard) insurance is required on your property, we plan to buy insurance** for your property. You must pay us for any period during which the insurance we buy is in effect but you do not have insurance.

You should immediately provide us with your insurance information. The information needed is: a copy of your insurance policy, your insurance policy declaration page or a certificate of insurance. To get this to us, do one of the following:

- Upload the information online, including your loan number and property address, at **Ihaveinsurance.com/BankofAmerica**.
- Fax the information, including your loan number, to (800) 293-8158.
- Mail the information, including your loan number, to the return address at the top of this letter.

The insurance we buy:

- May be significantly **more expensive than the insurance you can buy yourself.**
- May not provide **as much coverage as an insurance policy you buy yourself.**

If you have any questions, please contact us at (866) 265-3321, Monday through Friday, 8 a.m. to 9 p.m. Eastern.

Please see the enclosed "Important Information Regarding Your Home Loan Hazard Insurance" for general information about our hazard insurance coverage requirements.

**BANKRUPTCY NOTICE**

BANK OF AMERICA, N.A. IS REQUIRED BY LAW TO INFORM YOU THAT THIS COMMUNICATION IS FROM A DEBT COLLECTOR. IF YOU ARE CURRENTLY IN A BANKRUPTCY PROCEEDING OR HAVE PREVIOUSLY OBTAINED A DISCHARGE OF THIS DEBT UNDER BANKRUPTCY LAW, THIS NOTICE IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT AN ATTEMPT TO COLLECT A DEBT, A DEMAND FOR PAYMENT OR AN ATTEMPT TO IMPOSE PERSONAL LIABILITY FOR A DISCHARGED DEBT.

# *Important Information Regarding Your Home Loan Hazard Insurance*

## Hazard insurance and continuous coverage

You are required to maintain acceptable hazard insurance coverage on your property at all times to protect against loss on the property that serves as the collateral for your loan. If you don't provide evidence of acceptable coverage, we may buy Lender-Placed Insurance (LPI) for your property and charge you for the cost of this insurance.

LPI may be significantly more expensive and may not provide as much coverage as hazard insurance you can buy yourself. We strongly encourage you to buy your own hazard insurance and not rely on LPI.

The hazard insurance requirements applicable to your loan are contained in the "Hazard Insurance Requirements" section below. The hazard insurance you buy must, at a minimum, meet these requirements. The hazard insurance must also cover your property at all times.

If the hazard insurance you buy does not cover your property continuously, there will be a gap period for coverage. If you are unable to obtain coverage for a gap period, we may buy LPI for the gap period and charge you for the cost of this insurance. Please see the "Lender-Placed Insurance" section below for more important information about LPI.

## Hazard insurance requirements

At a minimum, your hazard insurance policy must:

- include fire and extended coverage policy.
- not limit or exclude from coverage (in whole or in part) damage or loss from fire, windstorm, hurricane, hail or any other perils that are a part of the extended coverage endorsement.
- provide for claims to be settled on a replacement cost basis, where available, and be in an amount at least equal to 100% of the insurable value of the improvements as established by the hazard insurer.
- include rent loss coverage for non-owner-occupied properties.
- use the same named insured on the policy as the named mortgagor/trustor/grantor on your security instrument, or current owner if there has been a loan assumption.
- include a Lender's Loss Payable Endorsement or standard mortgagee/loss payee clause in favor of Bank of America, N.A. and its successors and assigns.

The insurance policy must be issued by an insurance company acceptable to us. The insurance company must be:

- licensed, or otherwise authorized by law, to conduct business in the jurisdictions in which your property is located.
- written by an insurance company with a sufficient carrier rating from A.M. Best Company, Inc., Demotech, Inc., and Standard & Poor's.

You may provide us with a copy of your insurance policy, insurance policy declaration page or certificate of insurance. Due to changes in federal or state laws or regulations or for other reasons, we may modify our insurance requirements, including, without limitation, requiring additional types or amounts of coverage. If we make a change, we will notify you so that you may purchase the required coverage.

## Estimated coverage amount and term of coverage of Lender-Placed Insurance

We require you to maintain your hazard insurance coverage on a replacement cost basis. Except as noted, we will obtain LPI by using your last known hazard insurance coverage amount. This establishes a replacement cost value provided by the hazard insurer as the proxy for this amount. As of the date of this letter, the estimated LPI coverage amount for your property is $404,540.00. The coverage period will be effective from 06/12/2018 until 06/12/2019. This coverage represents the amount of your last known hazard insurance coverage amount contained in our records. If that information was not available, it represents the unpaid loan balance of your loan(s) secured by the property as the coverage amount, or the combined value of total liens serviced by the Bank, or the current credit limit of the line of credit

If you believe the estimated coverage amount does not reflect the replacement cost of your property, your last known hazard insurance coverage amount or the unpaid loan balance of your loan(s), please call us at the number below. You can also provide us with a written estimate of the replacement cost of your property from an insurance company of your choosing that meets our criteria for insurance companies as set forth in the "Hazard Insurance Requirements" section above.

**Offer of escrow account for hazard insurance**
If you don't currently have an escrow account and your loan is eligible, you can establish an escrow account for payment of your hazard insurance. To check eligibility and establish an escrow account, please call us at (866) 265-3321, Monday through Friday, 7 a.m. to 7 p.m. local time.

**Maximum Deductible Requirements**
The chart below explains our maximum deductible allowances for your preferred hazard insurance policy. In general, these amounts are the maximum amounts allowed by the owner, investor insurer, or guarantor of your loan.

**Maximum Allowed Deductible:**

| Type of Property/Loan | Maximum Deductible |
|---|---|
| Single Family Residence | 5% of the face amount of the policy.[1] |
| Condominium | Condo Master or Blanket Policy: 5% of the face amount of the policy. Individual Condo Unit Policy: 5% of the face amount of the policy. |
| Cooperative | Co-Op Project Policy: 5% of the face amount of the policy with no greater than 5% of the replacement cost for the individual unit. |
| Planned Unit Development (PUD) | PUD Blanket Policy: 5% of the replacement cost of the unit PUD Unit Policy: 5% of the face amount of the policy. |

**Note:** [1]The face amount of the policy would be the same as the "coverage amount" mentioned elsewhere in this document. Lender-Placed Insurance deductible amounts may differ.

## Condominiums and other property types with master hazard insurance policies

If you live in a condominium complex insured under a master policy issued to your condominium association, please send us a copy of the association's master policy to demonstrate proof of adequate hazard insurance coverage, using one of the methods shown above.

Certain additional insurance provisions may be required for Fannie Mae, Freddie Mac, Veterans Affairs, Federal Housing Administration/ Housing and Urban Development or other similar entities.

## Lender-Placed Insurance

If you don't maintain continuous acceptable hazard coverage on your property at all times, applicable law, investor requirements, and/or your loan agreement allows or requires us to buy hazard insurance, at your cost, to protect the property against loss. This is known as "Lender-Placed Insurance." Please note that LPI:

- may be significantly more expensive than the hazard insurance you can buy yourself;

- may not provide as much coverage as the hazard insurance you can buy yourself; for example, it will only cover the structure(s) on your property and will not include coverage for loss or damage to your personal property (such as the contents of your home), workers' compensation, injury to persons or property for which you may be personally liable, additional living expenses, medical payments, or for the risks of earthquake.

- may not be sufficient to protect your full equity interest in the improvements to the property should a loss occur and may not be sufficient to fully restore or repair such improvements to its previous condition.

- will not provide guaranteed or extended replacement cost coverage;

- may have other restrictions, exclusions and limitations specifically described in the coverage that we buy;

- in the event of a claim, all losses will be paid to us or the investor except amounts in excess of our or the investor's interest, which will be credited to you;

- is provided by an unaffiliated entity, we advance the LPI premium and pass the cost directly to you with no additional charges or fees

We will [...] for which you provide acceptable evidence of hazard insurance. You will only be charged the cost [...] covered by the policy(ies) you obtain. You will receive a full refund of the cost of LPI if your evidence [...] demonstrates continuous coverage for your property.

### How Lender-Placed Insurance is charged to you

If you have an existing escrow account, we charge the cost of LPI to this account. If you don't have an escrow account and your loan agreement allows, we'll establish an escrow account and charge the cost of the LPI to that account. If your loan is a home equity line of credit or similar loan product with a credit line, we'll either advance funds from your credit line to pay the cost of the LPI or charge you separately for the insurance. Also, please note, your loan agreement may provide that the cost of LPI becomes an additional debt secured by your mortgage or deed of trust.

## Housing counselor information

If you would like counseling or assistance, you can contact the U.S. Department of Housing and Urban Development (HUD). For a list of homeownership counselors or counseling organizations in your area, go to www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm or call 800.569.4287.

### If you have questions

Please call us at (866) 265-2321, Monday through Friday, 8 a.m. to 9 p.m. Eastern.

### BANKRUPTCY NOTICE

BANK OF AMERICA, N.A. IS REQUIRED BY LAW TO INFORM YOU THAT THIS COMMUNICATION IS FROM A DEBT COLLECTOR. IF YOU ARE CURRENTLY IN A BANKRUPTCY PROCEEDING OR HAVE PREVIOUSLY OBTAINED A DISCHARGE OF THIS DEBT UNDER BANKRUPTCY LAW, THIS NOTICE IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT AN ATTEMPT TO COLLECT A DEBT, A DEMAND FOR PAYMENT OR AN ATTEMPT TO IMPOSE PERSONAL LIABILITY FOR A DISCHARGED DEBT.

9046

Bank of America 🇺🇸

PO BOX 96.291
FORT WORTH, TX  76161

Notice Date: JULY 26, 2018

000902 - 005489
S Ji-Hong
22515 10TH AVE S
DES MOINES, WA  98198

Thank you for being a valued customer. We appreciate your relationship with us. We need your help in obtaining proof of your current insurance coverage within 30 days from the date of this notice.

We want to let you know that as of the date of this notice, we haven't received current insurance information on your property, which is typically provided to us by your insurance agent or carrier. Unfortunately, because we don't have current insurance information, we're required to send you the enclosed notice.

## What you need to know

- Please keep in mind, this notice provides certain information and disclosures required by federal law, but doesn't necessarily address your specific situation or circumstances.
- Please read the notice carefully and follow the steps outlined.

## We're here to help

We appreciate you working with us so we have the most current information to ensure your property is adequately insured and to help avoid lender-placed insurance.

If you have any questions, please call us at (866) 265-3321, Monday through Friday, 8 a.m. to 9 p.m. Eastern.

9046

**Bank of America**

Home Loans
P.O. BOX 961291
FORT WORTH, TX 76161

Notice Date: JULY 26, 2018

700922 - 005410
Sue Hong
22515 10TH AVE S
DES MOINES, WA  98198

Subject: **Second and final notice - please provide insurance information for**
22515 10TH AVENUE SOUTH
DES MOINES WA  98198

Dear Sue Hong:

This is your **second and final** notice that our records show that your homeowners (hazard) insurance expired, and we do not have evidence that you have obtained new coverage. **Because homeowners (hazard) insurance is required on your property, we plan to buy insurance for your property**. You must pay us for any period during which the insurance we buy is in effect but you do not have insurance.

You should immediately provide us with your insurance information. The information needed is: a copy of your insurance policy, your insurance policy declaration page or a certificate of insurance. To get this to us, do one of the following:

- Upload the information online, including your loan number and property address, at **Ihaveinsurance.com/BankofAmerica.**
- Fax the information, including your loan number, to (800) 293-8158.
- Mail the information, including your loan number, to the return address at the top of this letter.

The insurance we buy:

- **Will cost an estimated $3,317.23 annually, which may be significantly more expensive than insurance you can buy yourself.**
- **May not provide as much coverage as an insurance policy you buy yourself.**

If you have any questions, please contact us at (866) 265-3321, Monday through Friday, 8 a.m. to 9 p.m. Eastern.

Please see the enclosed 'Important Information Regarding Your Home Loan Hazard Insurance' for general information about our hazard insurance coverage requirements.

**BANKRUPTCY NOTICE**

BANK OF AMERICA, N.A. IS REQUIRED BY LAW TO INFORM YOU THAT THIS COMMUNICATION IS FROM A DEBT COLLECTOR. IF YOU ARE CURRENTLY IN A BANKRUPTCY PROCEEDING OR HAVE PREVIOUSLY OBTAINED A DISCHARGE OF THIS DEBT UNDER BANKRUPTCY LAW, THIS NOTICE IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT AN ATTEMPT TO COLLECT A DEBT, A DEMAND FOR PAYMENT OR AN ATTEMPT TO IMPOSE PERSONAL LIABILITY FOR A DISCHARGED DEBT.

# *Important Information Regarding Your Home Loan Hazard Insurance*

## Hazard insurance and continuous coverage

You are required to maintain acceptable hazard insurance coverage on your property at all times to protect against loss on the property that serves as the collateral for your loan. If you don't provide evidence of acceptable coverage, we may buy Lender-Placed Insurance (LPI) for your property and charge you for the cost of this insurance.

LPI may be significantly more expensive and may not provide as much coverage as hazard insurance you can buy yourself. We strongly encourage you to buy your own hazard insurance and not rely on LPI.

The hazard insurance requirements applicable to your loan are contained in the "Hazard Insurance Requirements" section below. The hazard insurance you buy must, at a minimum, meet these requirements. The hazard insurance must also cover your property at all times

If the hazard insurance you buy does not cover your property continuously, there will be a gap period for coverage. If you are unable to obtain coverage for a gap period, we may buy LPI for the gap period and charge you for the cost of this insurance. Please see the "Lender-Placed Insurance" section below for more important information about LPI.

## Hazard insurance requirements

At a minimum, your hazard insurance policy must:

- include fire and extended coverage policy.
- not limit or exclude from coverage (in whole or in part) damage or loss from fire, windstorm, hurricane, hail or any other perils that are a part of the extended coverage endorsement.
- provide for claims to be settled on a replacement cost basis, where available, and be in an amount at least equal to 100% of the insurable value of the improvements as established by the hazard insurer.
- include rent loss coverage for non-owner-occupied properties.
- use the same named insured on the policy as the named mortgagor/trustor/grantor on your security instrument, or current owner if there has been a loan assumption.
- include a Lender's Loss Payable Endorsement or standard mortgagee/loss payee clause in favor of Bank of America, N.A. and its successors and assigns.

The insurance policy must be issued by an insurance company acceptable to us. The insurance company must be:

- licensed, or otherwise authorized by law, to conduct business in the jurisdictions in which your property is located.
- written by an insurance company with a sufficient carrier rating from A.M. Best Company, Inc., Demotech, Inc., and Standard & Poor's.

You may provide us with a copy of your insurance policy, insurance policy declaration page or certificate of insurance.
Due to changes in federal or state laws or regulations or for other reasons, we may modify our insurance requirements, including, without limitation, requiring additional types or amounts of coverage. If we make a change, we will notify you so that you may purchase the required coverage.

## Estimated coverage amount and term of coverage of Lender-Placed Insurance

We require you to maintain your hazard insurance coverage on a replacement cost basis. Except as noted, we will obtain LPI by using your last known hazard insurance coverage amount. This establishes a replacement cost value provided by the hazard insurer as the proxy for this amount. As of the date of this letter, the estimated LPI coverage amount for your property is $404,540.00. The coverage period will be effective from 06/12/2018 until 06/12/2019. This coverage represents the amount of your last known hazard insurance coverage amount contained in our records. If that information was not available, it represents the unpaid loan balance of your loan(s) secured by the property as the coverage amount, or the combined value of total liens serviced by the Bank, or the current credit limit of the line of credit.

If you believe this estimated coverage amount does not reflect the replacement cost of your property, your last known hazard insurance coverage amount or the unpaid loan balance of your loan(s), please call us at the number below. You can also provide us with a written estimate of the replacement cost of your property from an insurance company of your choosing that meets our criteria for insurance companies as set forth in the "Hazard Insurance Requirements" section above.

**Offer of escrow account for hazard insurance**
If you don't currently have an escrow account and your loan is eligible, you can establish an escrow account for payment of your hazard insurance. To check eligibility and establish an escrow account, please call us at (866) 265-3321, Monday through Friday, 7 a.m. to 7 p.m. local time.

**Maximum Deductible Requirements**
The chart below explains our maximum deductible allowances for your preferred hazard insurance policy. In general, these amounts are the maximum amounts allowed by the owner, investor insurer, or guarantor of your loan.

**Maximum Allowed Deductible:**

| Type of Property/Loan | Maximum Deductible |
|---|---|
| Single Family Residence | 5% of the face amount of the policy.[1] |
| Condominium | Condo Master or Blanket Policy: 5% of the face amount of the policy. Individual Condo Unit Policy: 5% of the face amount of the policy. |
| Cooperative | Co-Op Project Policy: 5% of the face amount of the policy with no greater than 5% of the replacement cost for the individual unit. |
| Planned Unit Development (PUD) | PUD Blanket Policy: 5% of the replacement cost of the unit PUD Unit Policy: 5% of the face amount of the policy. |

**Note:** [1]The face amount of the policy would be the same as the "coverage amount" mentioned elsewhere in this document. Lender-Placed Insurance deductible amounts may differ.

## Condominiums and other property types with master hazard insurance policies

If you live in a condominium complex insured under a master policy issued to your condominium association, please send us a copy of the association's master policy to demonstrate proof of adequate hazard insurance coverage, using one of the methods shown above.

Certain additional insurance provisions may be required for Fannie Mae, Freddie Mac, Veterans Affairs, Federal Housing Administration/ Housing and Urban Development or other similar entities.

## Lender-Placed Insurance

If you don't maintain continuous acceptable hazard coverage on your property at all times, applicable law, investor requirements, and/or your loan agreement allows or requires us to buy hazard insurance, at your cost, to protect the property against loss. This is known as "Lender-Placed Insurance." Please note that LPI:

- may be significantly more expensive than the hazard insurance you can buy yourself;

- may not provide as much coverage as the hazard insurance you can buy yourself; for example, it will only cover the structure(s) on your property and will not include coverage for loss or damage to your personal property (such as the contents of your home), workers' compensation, injury to persons or property for which you may be personally liable, additional living expenses, medical payments, or for the risks of earthquake.

- may not be sufficient to protect your full equity interest in the improvements to the property should a loss occur and may not be sufficient to fully restore or repair such improvements to its previous condition.

- will not provide guaranteed or extended replacement cost coverage;

- may have other restrictions, exclusions and limitations specifically described in the coverage that we buy;

- in the event of a claim, all losses will be paid to us or the investor except amounts in excess of our or the investor's interest, which will be credited to you;

- is provided by an unaffiliated entity, we advance the LPI premium and pass the cost directly to you with no additional charges or fees

We will [...] notice for which you provide acceptable evidence of hazard insurance. You will only be charged the cost [...] the portion not covered by the policy(ies) you obtain. You will receive a full refund of the cost of LPI if your evidence of coverage demonstrates continuous coverage for your property.

### How Lender-Placed Insurance is charged to you

If you have an existing escrow account, we charge the cost of LPI to this account. If you don't have an escrow account and your loan agreement allows, we'll establish an escrow account and charge the cost of the LPI to that account. If your loan is a home equity line of credit or similar loan product with a credit line, we'll either advance funds from your credit line to pay the cost of the LPI or charge you separately for the insurance. Also, please note, your loan agreement may provide that the cost of LPI becomes an additional debt secured by your mortgage or deed of trust.

## Housing counselor information

If you would like counseling or assistance, you can contact the U.S. Department of Housing and Urban Development (HUD). For a list of homeownership counselors or counseling organizations in your area, go to www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm or call 800.569.4287.

### If you have questions

Please call us at (966) 265-3321, Monday through Friday, 8 a.m. to 9 p.m. Eastern.

**BANKRUPTCY NOTICE**

BANK OF AMERICA, N.A. IS REQUIRED BY LAW TO INFORM YOU THAT THIS COMMUNICATION IS FROM A DEBT COLLECTOR. IF YOU ARE CURRENTLY IN A BANKRUPTCY PROCEEDING OR HAVE PREVIOUSLY OBTAINED A DISCHARGE OF THIS DEBT UNDER BANKRUPTCY LAW, THIS NOTICE IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT AN ATTEMPT TO COLLECT A DEBT, A DEMAND FOR PAYMENT OR AN ATTEMPT TO IMPOSE PERSONAL LIABILITY FOR A DISCHARGED DEBT.